CHAMBER OF COMMERCE OF MINNEAPOLIS v. JOHN E. WELLS and
Others.[1]

March 1, 1907.

Nos. 14,948—(141).

**Property in Market Quotations.**

The continuous market quotations of stocks, bonds, and grains, re-
ferred to in the opinion, obtained by plaintiff at considerable cost and ex-
pense for the exclusive use and benefit of itself and members, are, until
published to the public, property, and entitled to the protection of the law
as such.

**Same—Limited Publication.**

A limited and restricted publication of such quotations does not ex-
tinguish the exclusive property right therein.

**Same.**

A limited or restricted publication is one which communicates the quota-
tions to a select few upon condition expressly or impliedly precluding their
rightful ulterior communication, except in restricted private intercourse.

**General Publication.**

A publication not thus restricted, both as to persons and purpose, is
general.

**Same.**

The act of plaintiff in recording the quotations upon a blackboard in its
building for the information of its members, and like conduct on the part
of members in their private offices, being for the exclusive benefit of their
customers, such members, being under obligation to plaintiff not to dis-
close the quotations otherwise than in their own business intercourse,
does not constitute a general publication of the quotations, entitling the
public to appropriate and make use of the same.

**Injunction.**

A person not a member of plaintiff corporation, and not entitled to make
use of its quotations, may be restrained from wrongfully and unlawfully
obtaining the same.

**Injunction Sustained by Findings.**

The findings of the trial court *held* to show that defendant surrepti-
tiously and fraudulently obtained plaintiff's quotations without his knowl-
edge or consent, and the judgment restraining and enjoining further acts
in that direction *held* proper.

[1] Reported in 111 N. W. 157.

Action in the district court for Hennepin county to enjoin the defendants from obtaining, using or disseminating plaintiff's quotations. The case was tried upon a stipulation of facts before Holt, J., who made findings of fact and as conclusion of law found plaintiff was entitled to a permanent injunction against defendants. From an order denying a motion for a new trial, defendants appealed. Affirmed.

*F. D. Larrabee*, for appellants.

*Wilson & Mercer*, for respondent.

BROWN, J.

The facts in this case, briefly stated, are as follows: During all the time mentioned in the complaint plaintiff has been, and still is, a corporation, organized and existing under the laws of this state as the Chamber of Commerce of the City of Minneapolis. Its membership is composed of persons engaged in the business of buying, selling, and dealing in stocks, bonds, wheat, and other grains, and are admitted as such on terms and restrictions to be hereinafter referred to, including the payment of a valuable consideration. The business of the corporation is to aid and facilitate the conduct of the business affairs of its members, by obtaining and disseminating among them valuable information concerning the market price of the commodities dealt in by each. The property invested in its business approximates in value one million dollars, and the annual cost of maintaining it about $125,000. A large number of the members occupy offices in the building owned by plaintiff, where its business is carried on. Others occupy offices elsewhere.

During business hours each day plaintiff obtains for their use and benefit valuable information in many particulars, and especially the market price from time to time of stocks, bonds, and grains, which it causes to be placed upon a large blackboard in a room devoted to that purpose, whereon members may observe the same and make notations therefrom, communicating also the same information, by telephone or otherwise, to such of its members as do not office in its building. This information is obtained through telegraph and other means from other business centers at considerable cost and expense. Each person on becoming a member agrees that all quotations of prices of grains

and other commodities shall be used exclusively for his private benefit, and that he will not sell or in any way communicate the same to others, or allow or permit them to take or receive the same from him or his premises. A fair view of the record justifies the conclusion that the information acquired by plaintiff upon the matters referred to is intended for the exclusive benefit of its members, and that it has in no manner consented to or authorized the distribution thereof to others, except in the usual course of the transaction of business. It further appears that those members who maintain offices outside the Chamber of Commerce Building, and receive from time to time market quotations from plaintiff by telephone, immediately place the same upon blackboards in their own offices for the use and benefit of their customers, actual or prospective, but not for the use or benefit of others. The doors of these offices are, however, open to the public, and persons, whether customers or not, visit and frequent the same, and may make notations or memoranda from the quotations upon the blackboard, unknown to plaintiff or the member in whose office such information may be thus exposed. But, as already stated, it is not intended, either by plaintiff or the members, that strangers shall have free access to such offices, or the liberty to take away the result of their observations for the benefit of persons not members of the Chamber of Commerce; and all such persons are prohibited, so far as possible, from so doing.

Defendants named in the complaint were copartners at the time this action was commenced, two of whom died before answering, and defendant Johnston is now conducting the business carried on by the old firm under the name of J. E. Wells & Co. Defendant's business is that of commission or brokerage merchants, buying, selling, and dealing, for himself and others, in bonds, stocks, and grains for future delivery, with his office or place of business at 200 Third Street South, in Minneapolis. He is not a member of the Chamber of Commerce. He has in his office a large blackboard, upon which market quotations are placed for the information of his customers, similar to that maintained by the members of the Chamber of Commerce who do not have offices in plaintiff's building.

The trial court found that defendant wrongfully and surreptitiously obtained plaintiff's quotations in the following manner:

"(a) By going in person and through agents into the offices of said members of the Minneapolis Chamber of Commerce who maintained offices in said buildings with blackboards therein, as hereinbefore stated, for the sole purpose which they did not disclose of reading upon said blackboards the continuous quotations of the Minneapolis Chamber of Commerce as they occurred, and of then immediately going therefrom and conveying the same by telephone or otherwise to the defendant's said place of business.

"(b) By the defendants, either themselves or their agents, employing and engaging members of the Minneapolis Chamber of Commerce, so maintaining offices and blackboards in said buildings as commission merchants, to buy or sell for them upon the Minneapolis Chamber of Commerce grain for future delivery, and as such traders gaining admission into said grain offices of said commission merchants and availing themselves of the opportunity of reading said continuous quotations of plaintiff from said blackboards as they occurred, whereupon they would immediately go therefrom and convey the same by telephone or otherwise to defendant's place of business in the city of Minneapolis, without any knowledge upon the part of either plaintiff or any of its said members that such quotations were being so obtained and carried away.

"(c) By standing at times upon the public street and looking through a window into one of said offices and reading from the blackboard therein some of the continuous quotations, which were from ten to twenty feet from said window, and then conveying the same by telephone or otherwise to defendant's said place of business; but at certain times of the day they could not be seen in that way.

"(d) By standing at times on said stair landing in the public hall of said building and reading some of said continuous quotations as put up from said blackboard, through said window above the shade, and then immediately conveying the same by telephone or otherwise to defendant's said place of business.

"(e) By standing at times in a public hallway, near a door entering one of said offices, which was open for ventilation at intervals only,

and when it was open occasionally reading some of the quotations from the blackboards of said office and immediately conveying the same by telephone or otherwise to said defendant's office.

"(f) By inquiring and learning upon streets and in public hallways as to said continuous quotations of persons who had just been into some of said offices in said buildings and learned said continuous quotations in that manner, and upon hearing them immediately conveying the same by telephone or otherwise to defendant's said place of business.

"(g) By gaining said quotations by telephone from said members of said Minneapolis Chamber of Commerce, maintaining said offices in said buildings, and also by telephoning to members of the Minneapolis Chamber of Commerce maintaining offices in the building of the Minneapolis Chamber of Commerce asking, as traders would ask, for the information, and receiving it, without giving, or being required to give, the name of the inquirer or the purpose for which the information was to be used, but did not telephone sufficiently often to any one member to arouse suspicion.

"(h) By standing in public halls in said buildings in which said members maintained said offices, and hearing people in said trading rooms reading and announcing aloud in said trading rooms some of said quotations as they occurred, and immediately conveying the same by telephone or otherwise to defendant's said place of business."

The twentieth finding of fact is as follows: "That the said getting of said quotations by said defendants has been and is surreptitious, fraudulent, wrongful, and malicious, and the said using, posting, and disseminating of them in defendant's said business, as hereinbefore found, was and is fraudulent, wrongful, malicious, and unlawful."

Upon these facts, stated in greater detail in the findings, the trial court ordered judgment for plaintiff, restraining and enjoining defendant from obtaining or making use of plaintiff's market quotations in the manner set forth in the findings, or otherwise; and defendant appealed from an order denying a new trial.

It is conceded by defendant that plaintiff has a property right in its market quotations, obtained in the manner and for the purpose stated,

which cannot be taken or appropriated by others without its consent, given expressly or by a general unrestricted publication of the same. This is undoubtedly settled law, both in England and in this country. Exchange v. Gregory, 1 Q. B. Div. [1896] 147; Macklin v. Richardson, 2 Ambler, 694; Board of Trade v. Christie Grain & Stock Co., 198 U. S. 236, 25 Sup. Ct. 637, 49 L. Ed. 1031; Banker v. Caldwell, 3 Minn. 46 (94); Commercial v. Smith, 47 Hun, 494; Board of Trade v. Hadden-Krull Co. (C. C.) 109 Fed. 705; Board of Trade v. O'Dell Commission Co. (C. C.) 115 Fed. 574. Such quotations are in the nature of trade secrets, and entitled to protection as property, unless voluntarily given to the public, precisely as other property rights are protected by the law. This is conceded; but it is contended by defendant that the record discloses such a publication of the quotations in question as to defeat plaintiff's exclusive property right therein.

We come directly to that question. Much has been said by courts upon the question what constitutes a publication of literary productions and market quotations, like those here involved; but the consensus of view seems to be that a publication, to defeat the property right of the owner, must be general, or of a nature to entitle the public at large, without committing any wrongful act, to appropriate and use the same. The question of the intention of the owner is not of controlling importance. Publication of such information is unlike the dedication of property for a public use or the abandonment thereof. In those cases the intent of the owner determines whether there has been in the one instance a dedication, or in the other an abandonment; but in a case like that at bar, if there be in fact a publication of a character to enable the public, without fraud or collusion, to obtain the information, the property rights in the literary or other like production ceases, without regard to the intention of the owner. Intent in this case is important only as it tends to characterize the act of plaintiff in recording the information upon blackboards in its exchange rooms, and the same act of those of its members who occupy offices outside its building. If it was intended for the public benefit, a general publication would necessarily follow; but such is not the fact.

The method adopted by plaintiff of communicating the information to its members and to those having business relations with them is in no legitimate sense a surrender, intentionally or otherwise, of proprie-

tary rights. It is at most a limited and restricted publication. That there may be a limited and restricted publication is sustained by nearly all the authorities. A concise definition of what constitutes a limited publication is found in Keene v. Wheatley, 14 Fed. Cas. 180, where the court said: "A limited publication * * * .is an act which communicates a knowledge of the contents to a select few, upon conditions expressly or impliedly precluding its rightful ulterior communication, except in restricted private intercourse. * * * Any publication which is not thus restricted, both as to persons and purpose, is general" —citing Prince Albert v. Strange, 2 De Gex & S. 692, 1 Hall & T. 18; Jefferys v. Boosey, 4 H. L. Cas. 965. See, also, Macklin v. Richardson, 2 Ambler, 694; Jefferys v. Boosey, 4 H. L. Cas. 815; French v. Maguire, 55 How. Pr. 471; Palmer v. De Witt, 47 N. Y. 532, 7 Am. 480; New Jersey v. Dentacura Co., 57 N. J. Eq. 594, 41 Atl. 672.

This definition is the basis for many judicial opinions in discussing the question, and applies alike to literary productions, telegraphic news, letters, market quotations, trade secrets, and other information of a commercial value. In F. W. Dodge Co. v. Construction, 183 Mass. 62, 66 N. E. 204, 60 L. R. A. 810, 97 Am. St. 412, it was held that facts with reference to contemplated buildings or improvements, ascertained and compiled by effort and expense for use by contractors, so long as not given out to the public generally, are property, and entitled to the protection of the law; and, further, that the act of the compiler in furnishing the same to subscribers for their use, but under agreement on their part not to disclose them to others, was not a publication entitling strangers to appropriate the information thus compiled. The court in that case, after covering the question whether plaintiff therein had a property right in the compilation thus made, and holding that it had, on the subject of the alleged publication thereof said: "It is well established that the private circulation of information or literary composition, in writing or in print, for a restricted purpose,. is not a publication which gives the public a right to use it"—citing,. Prince Albert v. Strange, 1 Macn. & G. 25; Exchange v. Gregory,. 1 Q. B. Div. [1896] 147; Bartlett v. Crittenden, 5 McLean, 32, Fed.. Cas. No. 1,076.

In Parton v. Prang, 3 Cliff. 537, Fed. Cas. No. 10,784, involving property rights in manuscript, and whether the manuscript had been

published so as to entitle the public to appropriate it, the court said: "Independently of legislation, the sole proprietorship of a manuscript is in the author and his assigns until he publishes it. * * * But there may be a limited publication by communication of the contents by reading, representation, or restricted private circulation, which will not abridge the right of the author any further than necessarily results from the nature and extent of such limited use as he has made or allowed others to make. * * * Or, as Lord Brougham said in Jefferys v. Boosey, 4 H. L. Cas. 961: 'He may withhold, or he may communicate it, and, communicating, he may prescribe limitation and impose such restrictions as he please.'"

The rule was applied to market quotations in Board of Trade v. Hadden-Krull Co. (C. C.) 109 Fed. 705, where the court said: "These market quotations are peculiar in their property use and value, and, without immediate transmission to the customer, so that he receives them simultaneously with all other customers, and before their publication generally, they possess no purchase value. To make them available, it is essential to have the quotations written or printed in some form for the information of all entitled to their use; and it appears here that they were in some instances so furnished in the 'ticker,' and in others were placed on a blackboard in the office of the customer. No reason appears for finding a publication in the one method, if not in the other, and I am of opinion that neither constitutes a dedication to the public, while limited to the use and office of the customer. The testimony is undisputed that the quotations received by the defendant were wired to them by persons who obtained the reports by stealth and unfair means, without the consent or knowledge of the owner; and the reports so derived are not open to the defendants' use or benefit, unless they were equally open to the general public at the same moment."

See, also, Board of Trade v. Christie Grain & Stock Co. (C. C.) 116 Fed. 944, and National Tel. News Co. v. Western Union Tel Co., 119 Fed. 294, 56 C. C. A. 198, 60 L. R. A. 805.

The supreme court of the United States, in Board of Trade v. Christie Grain & Stock Co., 198 U. S. 236, 25 Sup. Ct. 637, 49 L. Ed. 1031, in disposing of the question, said: "In the first place, apart from special objections, the plaintiff's collection of quotations is entitled to the

protection of the law. It stands like a trade secret. The plaintiff has the right to keep the work which it has done, or paid for doing, to itself. The fact that others might do similar work, if they might, does not authorize them to steal the plaintiff's. Compare Bleistein v. Donaldson Lithographing Co., 188 U. S. 239, 249, 250," 23 Sup. Ct. 298, 47 L. Ed. 460. "The plaintiff does not lose its rights by communicating the result to persons, even if many, in confidential relations to itself, under a contract not to make it public, and strangers to the trust will be restrained from getting at the knowledge by inducing a breach of trust and using knowledge obtained by such a breach. Exchange Tel. Co. v. Gregory & Co. [1896] 1 Q. B. D. 147; F. W. Dodge Co. v. Construction Information Co., 183 Mass. 62," 66 N. E. 204, 60 L. R. A. 810, 97 Am. St. 412; "Board of Trade v. C. B. Thomson Commission Co., 103 Fed. Rep. 902; Board of Trade v. Hadden-Krull Co., 109 Fed. Rep. 705; National Tel. News Co. v. Western Union Tel. Co., 119 Fed. Rep. 294," 56 C. C. A. 198, 60 L. R. A. 805; "Illinois Commission Co. v. Cleveland Tel. Co., 119 Fed. 301," 56 C. C. A. 205.

Other authorities along the same line might be collected, almost without number; but it is unnecessary. Suffice it that those already cited voice the general trend of judicial opinion on the subject. The cases are all referred to and analyzed in a valuable note to Press Pub. Co. v. Monroe, 51 L. R. A. 353, and firmly establish the doctrine that a restricted or limited publication vests no rights in the public at large to the matters thus published.

We have only to determine, in conclusion, whether the methods adopted by plaintiff to communicate its quotations to its members, coupled with the restricted use the latter are entitled to make thereof, constitute such a general publication as to divest them of their character of private property. We have no particular difficulty in this branch of the case in reaching a conclusion adverse to defendant. It is beyond controversy that the quotations are acquired by plaintiff at considerable expense of time and money, and intended for the exclusive use of itself and its members. There is no controversy but that its members are expressly restricted in the use of the same, their contract obligation limits their use to their own business dealings, and no question but that defendant obtains them without the knowledge or consent of plaintiff or its members, but, on the contrary, surreptitiously

and by fraudulent means. The restrictions imposed by plaintiff are found running through all the cases where the question of general publication has come before the courts, and it has been held almost uniformly that their character as private property is not thereby lost. The act of posting them upon blackboards is not for the public eye or use, but for the benefit of the simultaneous observation and use of members; and the mere fact that strangers to the chamber may wrongfully and without its consent see and make copies thereof does not change their private character, nor render the wrongful appropriation rightful. The methods adopted by defendants, as disclosed by the findings of the trial court above set out in full, to obtain the quotations, are surreptitious, stealthful, and fraudulent, and not by reason of any right expressly or impliedly granted or intended to be granted by the chamber.

And we hold, without further discussion of the question, that the facts do not show a general publication of the quotations, and defendants' acts are wrongful and unlawful and may be restrained. Any other disposition of the case, on the facts as stipulated and found by the court, would render the property character of such quotations and the right of limited or restricted publication a mere myth.

Our conclusions are in harmony with those reached by the learned trial court, and his order denying a new trial is affirmed.