### RCA MFG. CO., Inc., v. WHITEMAN et al.
### No. 357.

Circuit Court of Appeals, Second Circuit.
July 25, 1940.
Writ of Certiorari Denied Dec. 16, 1940.
See 61 S.Ct. 393, 85 L.Ed. ——.

Crawford & Sprague, of New York City (White & Case, Joseph M. Hartfield, and Stuart Sprague, all of New York City, of counsel), for W. B. O. Broadcasting Corporation.

David Mackay, of New York City (David Mackay, Lawrence B. Morris, and Jerome H. Adler, all of New York City, of counsel), for RCA Mfg. Co., Inc.

Maurice J. Speiser, of New York City (Herbert A. Speiser and Nathan Bass, both of New York City, of counsel), for Paul Whiteman.

Before L. HAND, CLARK, and PATTERSON, Circuit Judges.

L. HAND, Circuit Judge.

This case comes up upon appeals by the plaintiff, RCA Manufacturing Company, Inc., and the defendants, Paul Whiteman and W. B. O. Broadcasting Corporation. Before the action was brought Whiteman had filed a complaint against W. B. O. Broadcasting Corporation and Elin, Inc., to restrain the broadcasting of phonograph records of musical performances by Whiteman's orchestra. By leave of court RCA Manufacturing Company, Inc., then filed the complaint at bar, as ancillary to Whiteman's action, asking the same relief against W. B. O. Broadcasting Corporation and Elin, Inc., as Whiteman had asked in his action, and in addition asking that Whiteman be adjudged to have no interest in the records of his performances, because of contracts between him and itself. Whiteman thereupon discontinued his action, leaving only the ancillary action in which the judgment on appeal was entered. The dispute is as to whether W. B. O. Broadcasting Corporation, as the purchaser of phonographic records prepared by RCA Manufacturing Company, Inc., of Whiteman's orchestral performances, may broadcast them by radio. Whiteman's performances took place in studios of RCA Manufacturing Company, Inc., which arranged for their reproduction upon ordinary phonographic disc records, and which, with the consent of Whiteman, sold the records to the public at large. Of the nine records here in question five were sold between November, 1932, and August 15, 1937, during which period every rec-

ord bore the legend: "Not Licensed for Radio Broadcast". (Apparently the four earlier records did not advise the purchaser of any such limitation.) After August 15, 1937, this notice was changed to read as follows: "Licensed by Mfr. under U. S. Pats. 1625705, 1637544, RE. 16588 (& other Pats. Pending) Only For Non-Commercial Use on Phonographs in Homes. Mfr. & Original Purchaser Have Agreed This Record Shall Not Be Resold Or Used For Any Other Purpose. See Detailed Notice on Envelope." These later records were inclosed in envelopes which even more clearly gave notice of the same limitations. W. B. O. Broadcasting Corporation every week bought from a New York company, Bruno-New York, Inc., such records as it needed; it used them thereafter to broadcast over its radio system. Bruno-New York, Inc., had bought the records in question under a contract with RCA Manufacturing Company, Inc., in which they agreed after its date (August 9, 1937) to resell "only for non-commercial use on phonographs in homes as per the notice appearing on the record labels and envelopes." It may be assumed that W. B. O. Broadcasting Corporation is charged with notice of the legends on the records, and with the contract of Bruno-New York, Inc., and that it broadcasts them on its radio system in disregard of both.

The questions raised below were whether Whiteman and/or RCA Manufacturing Company, Inc., had any musical property at common-law in the records which radio broadcasting invaded; whether Whiteman had passed any rights which he may have had to RCA Manufacturing Company, Inc., under certain agreements, not necessary to be set out; and whether, if either Whiteman or RCA Manufacturing Company, Inc., had any such common-law property, the legends and notice enabled them, or either of them, to limit the uses which the buyer might make of the records. The judge held that all of Whiteman's rights had passed to RCA Manufacturing Company, Inc., which for that reason was entitled to enjoin the broadcasting of these records; and that Whiteman was also entitled to an injunction against W. B. O. Broadcasting Corporation because it was unfair competition to broadcast his performances without his consent. All parties appealed except Elin, Inc. The RCA Manufacturing Company,

Inc., appealed because the judge did not recognize its common-law artistic property, arising out of the skill and art necessary to obtain good recording, and also because of the affirmative relief granted to Whiteman. Whiteman appealed because of the holding that he had lost all his rights to RCA Manufacturing Company, Inc., under its contracts with him. W. B. O. Broadcasting Corporation appealed because any relief was granted against it.

■ It is only in comparatively recent times that a virtuoso, conductor, actor, lecturer, or preacher could have any interest in the reproduction of his performance. Until the phonographic record made possible the preservation and reproduction of sound, all audible renditions were of necessity fugitive and transitory; once uttered they died; the nearest approach to their reproduction was mimicry. Of late, however, the power to reproduce the exact quality and sequence of sounds has become possible, and the right to do so, exceedingly valuable; people easily distinguish, or think they distinguish, the rendition of the same score or the same text by their favorites, and they will pay large sums to hear them. Hence this action. It was settled at least a century ago that the monopoly of the right to reproduce the compositions of any author—his "common-law property" in them—was not limited to words; pictures were included. Turner v. Robinson, 10 Ir.Ch. 121; S.C. 10 Ir.Ch. 522; Prince Albert v. Strange, 1 McN. & G. 25. This right has at times been stated as though it extended to all productions demanding "intellectual" effort; and for the purposes of this case we shall assume that it covers the performances of an orchestra conductor, and —what is far more doubtful—the skill and art by which a phonographic record maker makes possible the proper recording of those performances upon a disc. It would follow from this that, if a conductor played over the radio, and if his performance was not an abandonment of his rights, it would be unlawful without his consent to record it as it was received from a receiving set and to use the record. Arguendo, we shall also assume that such a performance would not be an abandonment, just as performance of a play, or the delivery of a lecture is not; that is, that it does not "publish" the work and dedicate it to the public. Ferris v. Frohman, 223 U.S. 424, 435, 32 S.Ct. 263, 56 L.Ed. 492; Nutt v. National Institute, 2 Cir., 31 F.2d 236; McCarthy & Fischer v. White, D.C., 259 F. 364; Uproar Co. v. National Broadcasting Co., D.C., 8 F. Supp. 358. Nevertheless, even if Whiteman's "common-law property" in his performances survived the sale of the records on which they were inscribed, it would be very difficult to see how he, or à fortiori the maker of the records, could impose valid restrictions upon their resale. Concededly that could not be done (regardless of the present statutory prohibition) if the restriction went to the resale price. Bobbs-Merrill Co. v. Straus, 210 U.S. 339, 28 S.Ct. 722, 52 L.Ed. 1086. It would also have been impossible if the restriction forbad the buyer to use the article except with other articles bought of the record maker. Motion Picture Patents Co. v. Universal Film Co., 243 U.S. 502, 37 S.Ct. 416, 61 L.Ed. 871, L.R.A.1917E, 1187, Ann. Cas.1918A, 959. We do not, however, have that question to decide, for we think that the "common-law property" in these performances ended with the sale of the records and that the restriction did not save it; and that if it did, the records themselves could not be clogged with a servitude.

■ Copyright in any form, whether statutory or at common-law, is a monopoly; it consists only in the power to prevent others from reproducing the copyrighted work. W. B. O. Broadcasting Corporation has never invaded any such right of Whiteman; they have never copied his performances at all; they have merely used those copies which he and the RCA Manufacturing Company, Inc., made and distributed. The putatively protected performances were themselves intended for that purpose and for that alone; the situation was precisely the same as though Whiteman and RCA Manufacturing Company, Inc., had combined to produce an original musical score and inscribe it upon records. The records at bar embodied Whiteman's "common-law property"—his contribution as a conductor—in precisely the same way that the record of such a score would embody his composition. Hence the question is no different from whether he might disseminate a musical score to the public at large, but impose a limitation upon it that buyers should not use it to broadcast for profit. Whatever might be said of that—if the sale were not a "publication"—it will hard-

ly be argued that if it was a "publication" in the sense that that destroys the "common-law property", the restriction upon the use of the record would be valid notwithstanding. Restrictions upon the uses of chattels once absolutely sold are at least prima facie invalid; they must be justified for some exceptional reason, normally they are "repugnant" to the transfer of title. If "the common-law property" in the rendition be gone, then anyone may copy it who chances to hear it, and may use it as he pleases. It would be the height of "unreasonableness" to forbid any uses to the owner of the record which were open to anyone who might choose to copy the rendition from the record. To revert to the illustration of a musical score, it would be absurd to forbid the broadcast for profit of its record, if any hearer might copy it and broadcast the copy. Thus, even if Whiteman and RCA Manufacturing Company, Inc., have a "common-law property" which performance does not end, it is immaterial, unless the right to copy the rendition from the records was preserved through the notice of the restriction.

■ As applied to books, where the problem is precisely the same, there is not very much law as to whether such restrictions prevent complete dedication, but the judges who have passed upon the question have declared, at times with much certainty, that they are nugatory. In 1898 the Court of Appeals of New York flatly so decided in Jewelers Mercantile Agency v. Jewelers Publishing Co., 155 N.Y. 241, 49 N.E. 872, 41 L.R.A. 846, 63 Am.St.Rep. 666, and that is the leading case. Judge Putnam had held the same in 1896 (Ladd v. Oxnard, C.C., 75 F. 703, 730) and he was followed by Judge Townsend (Larrowe-Loisette v. O'Loughlin, C.C., 88 F. 896), Judge Lacombe (Wagner v. Conried, C.C., 125 F. 798) and Judge Ward (Savage v. Hoffman, C.C., 159 F. 584). In his dissenting opinion in International News Service v. Associated Press, 248 U. S. 215, 256, 39 S.Ct. 68, 63 L.Ed. 211, 2 A.L.R. 293, Mr. Justice Brandeis spoke of the law as "well-settled" to that effect. See also the reasoning of the court in Chamber of Commerce v. Wells, 100 Minn. 205, 111 N.W. 157. It is quite true that if "publication" were merely a question of intent, these decisions are wrong, for the intent is obvious not to dedicate the whole right. The problem is not so simple; in

dealing with a monopoly the law imposes its own limits. Certainly when the "common-law property" is in a work which the Copyright Act, 17 U.S.C.A. § 1 et seq., covers, there can be no doubt; Congress has created the monopoly in exchange for a dedication, and when the monopoly expires the dedication must be complete. If the records were registrable under the act, the restriction would therefore certainly not limit the dedication. The fact that they are not within the act should make no difference. It is indeed argued that by virtue of Donaldson v. Becket, 4 Burr. 2408, there is a perpetual common-law copyright in works not copyrightable under the act; we have answered that argument in Fashion Originators Guild v. Federal Trade Commission, 2 Cir., 114 F.2d 80, and need not repeat what we said. That being true, we see no reason why the same acts that unconditionally dedicate the common-law copyright in works copyrightable under the act, should not do the same in the case of works not copyrightable. Otherwise it would be possible, at least pro tanto, to have the advantage of dissemination of the work at large, and to retain a perpetual though partial, monopoly in it. That is contrary to the whole policy of the Copyright Act and of the Constitution. Any relief which justice demands must be found in extending statutory copyright to such works, not in recognizing perpetual monopolies, however limited their scope.

■ It is true that the law is otherwise in Pennsylvania, whose Supreme Court in 1937 decided that such a legend as the records at bar bore, fixed a servitude upon the discs in the hands of any buyer. Waring v. WDAS Broadcasting Company, 327 Pa. 433, 194 A. 631. We have of course given the most respectful consideration to the conclusions of that great court, but with much regret we find ourselves unconvinced for the reasons we have tried to state. However, since that is the law of Pennsylvania and since the broadcasting will reach receiving sets in that state, it will constitute a tort committed there; and if an injunction could be confined to those sets alone, it would be proper. It cannot; for even if it be mechanically possible to prevent any broadcasting through the angle which the state of Pennsylvania subtends at the transmission station, that would shut out points both in front of, and beyond, Pennsylvania. We

must therefore choose between denying any injunction whatever—since in our judgment the act is unlawful only in Pennsylvania—or enjoining W. B. O. Broadcasting Corporation from broadcasting throughout the Union and in Canada in order to prevent a tort in Pennsylvania alone. This would be an obvious misuse of the writ which goes only in aid of justice.

■ Whiteman and the plaintiff also rest their case upon the theory of unfair competition, depending for that upon International News Service v. Associated Press, supra, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211, 2 A.L.R. 293. That much discussed decision really held no more than that a western newspaper might not take advantage of the fact that it was published some hours later than papers in the east, to copy the news which the plaintiff had collected at its own expense. In spite of some general language it must be confined to that situation (Cheney Bros. v. Doris Silk Corp., 2 Cir., 35 F.2d 279, 281); certainly it cannot be used as a cover to prevent competitors from ever appropriating the results of the industry, skill, and expense of others. "Property" is a historical concept; one may bestow much labor and ingenuity which inures only to the public benefit; "ideas", for instance, though upon them all civilization is built, may never be "owned". The law does not protect them at all, but only their expression; and how far that protection shall go is a question of more or less; an author has no "natural right" even so far, and is not free to make his own terms with the public. In the case at bar if Whiteman and RCA Manufacturing Company, Inc., cannot bring themselves within the law of common-law copyright, there is nothing to justify a priori any continuance of their control over the activities of the public to which they have seen fit to dedicate the larger part of their contribution. We are adjured that courts must adjust themselves to new conditions, and that in the case at bar justice clearly points the way to some relief. We cannot agree; no doubt we should be jealous to execute all reasonable implications of established doctrines; but we should be equally jealous not to undertake the composition of substantial conflicts of interests, between which neither the common-

law, nor the statute, has given any clue to its preference. We cannot know how Congress would solve this issue; we can guess—and our guess is that it would refuse relief as we are refusing it—but if our guess were the opposite, we should have no right to enforce it. If the talents of conductors of orchestras are denied that compensation which is necessary to evoke their efforts because they get too little for phonographic records, we have no means of knowing it, or any right to assume it; and it is idle to invoke the deus ex machina of a "progress" which is probably spurious, and would not be for us to realize, if it were genuine.

■ Finally, appeal is made to the doctrine that W. B. O. Broadcasting Corporation is guilty of a tort—or at least that it is a factor in determining its "unfair" competition—because it induces Bruno-New York, Inc., to violate its contract with RCA Manufacturing Company, Inc. Whatever remedies RCA Manufacturing Company, Inc., may have under that contract, they are not before us. As between Bruno-New York, Inc., and W. B. O. Broadcasting Corporation, the contract is a nullity; RCA Manufacturing Company, Inc., had no power to impose the pretended servitude upon the records; and W. B. O. Broadcasting Corporation is free to buy and use them in entire disregard of any attempt to do so. It scarcely seems necessary to discuss the strange assertion that to broadcast the records in some way invades somebody's "right of privacy", presumably Whiteman's. Sidis v. F-R Publishing Corp., 2 Cir., 113 F.2d 806. Nor need we say that insofar as radio announcers declare, directly or indirectly, that the broadcast of a Whiteman record is the broadcast of a Whiteman performance, that conduct is a tort which Whiteman could enjoin. That would indeed be "unfair competition".

It follows that the complaint must be dismissed, and for reasons which make it unnecessary to determine how far Whiteman's contracts with RCA Manufacturing Company, Inc., preserved any common-law copyrights he might have had, if they had survived the sale of the records.

Judgment reversed; complaint dismissed; costs to W. B. O. Broadcasting Corporation.