**CAPITOL RECORDS, Inc., Plaintiff-Appellee,**

v.

**MERCURY RECORDS CORPORATION, Defendant-Appellant.**

**No. 95, Docket 23215.**

United States Court of Appeals
Second Circuit.

Argued Jan. 5, 1955.

Decided April 12, 1955.

10. Greer v. Wine, 219 Ark. 425, 243 S.W. 2d 13; Greer v. Blocker, 218 Ark. 259, 236 S.W.2d 68; and Benton v. Nowlin, 187 Ark. 738, 62 S.W.2d 16.

L. Hand, Circuit Judge, dissented.

Arthur E. Garmaize, New York City, for plaintiff-appellee.

Paul J. Kern, New York City, for defendant-appellant, Rhoda Hendrick Karpatkin, New York City, of counsel.

Before L. HAND and MEDINA, Circuit Judges, and DIMOCK, District Judge.

DIMOCK, District Judge.

Plaintiff obtained below an injunction against manufacture and distribution of phonograph records by defendant. The phonograph records bear recordings of performances by highly gifted artists of certain musical compositions. Since each party by stipulation disclaims ownership in any of the compositions by virtue of copyright, we treat them as in the public domain for the purposes of the case. Plaintiff derives its title, such as it is, from Telefunkenplatte, G.m.b.H., hereinafter called "Telefunken", in Berlin, Germany, which purported to sell to plaintiff matrix records and to grant to plaintiff the right to manufacture and distribute copy records in the United States. Defendant derives its title, such as it is, from an alien property administration in Czechoslovakia which purported to grant to defendant's predecessor in title the right to use identical matrix records and the right to manufacture therefrom, and distribute, copy records in the United States. Telefunken was the original owner of these matrix records which came from Czechoslovakia and had furnished them to an organization in that country giving it the right to reproduce and sell copies in a limited territory which did not include the United States.

The records have not been copyrighted. If they are subject to copyright we are clear that the rights of the parties to make and sell copies are to be determined under federal law. We must first determine, therefore, whether or not

phonograph records of compositions in the public domain recorded by musical artists are susceptible of copyright.

There can be no doubt that, under the Constitution, Congress could give to one who performs a public domain musical composition the exclusive right to make and vend phonograph records of that rendition. The question is whether Congress has done so.

It is plain that, prior to the 1909 amendment of the Copyright Act, Congress had not accorded to one who performed such a composition that exclusive right. The Supreme Court held in White-Smith Music Publishing Company v. Apollo Company, 209 U.S. 1, 28 S.Ct. 319, 52 L.Ed. 655, that the holder of the copyright of a musical composition did not have the exclusive right to make and vend music rolls for mechanical pianos. It was determined that the music rolls were not "copies" of the musical composition within the copyright owner's exclusive right to make "copies" of the composition. From this it follows that it was not the intention of Congress that a virtuoso's rendition of a musical composition in the public domain could be copyrighted under the unamended Act because it provided that "No person shall be entitled to a copyright unless he shall * * * not later than the day of the publication * * * deliver at the office of the Librarian of Congress * * * two copies" of the work of which the copyright was sought. R.S. § 4956, as amended by Act March 3, 1891, c. 565, § 3, 26 Stat. 1107, 17 U.S.C.A. § 13 note. Mechanical reproductions of such a rendition are the only possible means of duplication. The virtuoso himself could not give two performances precisely alike, yet "copies" were necessary to secure copyright and mechanical reproductions were not "copies".

To meet the holding that the owner of the copyright of a musical composition could not enjoin the making and vending of music rolls and records, Congress amended the Act in 1909, Act March 4, 1909, c. 320, 35 Stat. 1075. To change that result it could have declared that a mechanical reproduction of a musical composition should constitute a "copy" thereof within the meaning of the Act. Under such an amendment a virtuoso might copyright his rendition by depositing two records with the Librarian of Congress under section 4956 above quoted and thereafter be entitled to enjoin the reproduction of copies of those records. Congress, however, did not adopt that plan. Instead it enacted in section 1(e), 17 U.S.C. § 1(e), that any person complying with the provisions of the Act should have the exclusive right "[t]o perform the copyrighted work publicly for profit if it be a musical composition; and * * * to make * * * any form of record [of it] in which the thought of an author may be recorded and from which it may be read or reproduced".

Thus Congress met the narrow problem presented by the Apollo case. From thenceforward one who had copyrighted a musical composition by publishing written copies thereof with the copyright notice * had the exclusive right to make records thereof. No attempt was made to meet a case like that at bar where, in the nature of things, the performance of the artist could be copyrighted only in the form of a record. Nothing in the Act indicates an intention that the record shall be the "copyrighted work". Section 1(e) from which we have just quoted goes on to refer to the provisions of the Act so far as they secure, not copyright "of" the parts of instruments serving to reproduce mechanically the musical work, but copyright "controlling" such parts. It further refers to the use of the "copyrighted work" *upon* the parts of instruments.

Congress provided no means for copyrighting a virtuoso's rendition of a musical composition in the public domain. Under section 9 of the Act, 17 U.S.C. § 10, copyright is secured by publication with the notice of copyright. By section

* The new method of securing copyright prescribed by section 9 of the amended Act, 17 U.S.C. § 10.

19, 17 U.S.C. § 20, it is provided that the notice shall be applied in the case of a musical work "either upon its title page or the first page of music". The old plan of deposit of copies was not abandoned, however, and now "copies" must be deposited with the Register of Copyrights under section 12, 17 U.S.C. § 13, and, under section 13, 17 U.S.C. § 14, the Register may, upon failure to deposit copies, bring proceedings which will result in voiding the copyright.

That the actual intent of Congress coincided with the intent as expressed in these words of the statute as amended in 1909 appears from the Report of the Committee on Patents which accompanied the House of Representatives bill that embodied the amendment. That Report, H.R.Rep., No. 2222, 60th Cong., 2d Sess. 10, stated, immediately following the discussion of section 1(e):

> "It is not the intention of the committee to extend the right of copyright to the mechanical reproductions themselves, but only to give the composer or copyright proprietor the control, in accordance with the provisions of the bill, of the manufacture and use of such devices."

In some quarters the possibility has been suggested that section 4 of the Copyright Act added in 1909, 35 Stat. 1076, 17 U.S.C. § 4, providing "the works for which copyright may be secured under this Act shall include all the writings of an author", constituted an exhaustion of the constitutional power of Congress to extend copyright protection and consequently clothed phonograph records with copyright protection. Hale, 13 C.J. 1035; Weil, Copyright Law (1917), 214; Howell, The Copyright Law (3rd ed. 1952), 8. Not only does the language of the rest of the amendment negate the intention to extend copyright protection to phonograph records, as above indicated, but again the above quotation from the Report of the Committee on Patents gives the answer when it states, "[i]t is not the intention of the Committee to extend the right of copy-

right to the mechanical reproductions themselves."

This express disclaimer of intention to extend the right of copyright to the mechanical reproductions themselves makes it impossible to misunderstand a further statement in the Report of the Committee on Patents, p. 10:

> "Section 4 is declaratory of existing law. It was suggested that the word 'works' should be substituted for the word 'writings', in view of the broad construction given by the courts to the word 'writings', but it was thought better to use the word 'writings' which is the word used in the Constitution. It is not intended by the use of this word to change in any way the construction which the courts have given it."

From the foregoing it appears, first, that Congress, before the 1909 amendment, intended that one who performed a public-domain musical composition should not be able to obtain copyright protection for a phonographic record thereof, and, second, that nothing in the 1909 amendment indicated any change in that intention.

That conclusion is supported by the opinion in RCA Mfg. Co. v. Whiteman, 2 Cir., 114 F.2d 86, 89, where this court stated arguendo that phonograph records are not registerable under the Act. Judge Leibell in Jerome v. Twentieth Century Fox-Film Corp., D.C.S.D.N.Y., 67 F.Supp. 736, 742, affirmed, 2 Cir., 165 F.2d 784, said that a "victrola record cannot be copyrighted", citing Judge Hazel's opinion in Aeolian Co. v. Royal Music Roll Co., D.C.W.D.N.Y., 196 F. 926, 927, "While, under the provisions of the copyright law, such music rolls or records are not strictly matters of copyright, Congress in passing the enactment evidently intended to protect copyright proprietors in their right to their productions, and to give them an exclusive right to print, publish, and vend the same." In Waring v. WDAS Broadcasting Station, Inc., 327 Pa. 433, 194 A. 631, 633, it was admitted on all hands that the right claimed by

an orchestra proprietor to prevent the sale of records of his performances was not the subject of protection under existing copyright laws.

■ Since the Copyright Act does not deal with the protection of phonograph records of the performances of public-domain compositions by virtuosos, we have no basis for applying federal law. We must apply the law which would have been applied in the courts of the state embracing the district of the court below. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188. To decide the case before us we must resolve the competing claims of a plaintiff which derives its rights from a grant from Telefunken in Germany and a defendant which derives its rights from a grant from an alien property administration in Czechoslovakia. We must determine what law the New York State courts would apply to ascertain the extent of the respective rights of plaintiff and defendant. We find a complete dearth of authority on the question in New York and consequently must make the decision upon principle. We believe that where the extent of literary property within a given jurisdiction is in question and that extent depends upon acts which have taken place outside of that jurisdiction, the determination should be made according to the law of that jurisdiction as though the acts had taken place within its borders. Literary property is in essence a right to exclude, to a greater or lesser extent, others from making some or all use of the expressed thoughts of an author. The number of the conceivable grades of the extent of the exclusion and the number of the conceivable kinds of uses of the thoughts of authors are almost limitless. If we leave those questions of the scope of the right to any law other than that of the place where the right is sought to be exercised we may be faced with dealing with property interests unknown to our law.

■ The English rule seems to be that such questions are determined according to the law of the place where the rights are sought to be exercised. In the leading case of Celementi v. Walker, 2 Barnewall & Cresswell 861, it was ruled that what would have been a dedication in England had the effect of a dedication even though it took place abroad. Then too the rule that we are adopting is in harmony with the settled law that a copyright has no extra-territorial effect. See American Code Co. v. Bensinger, 2 Cir., 282 F. 829, 833. Until we have a uniform international law of literary property, it will be much more convenient to determine the effect of each act by the law of the place where the right of property is sought to be exercised.

We shall therefore determine the respective rights of plaintiff and defendant as though they had been created by the law of the State of New York.

Telefunken, in Germany, purported to grant to defendant's predecessor in title the right to make and vend the phonograph records in Czechoslovakia. Defendant's predecessor proceeded to make and vend the phonograph records in Czechoslovakia. Telefunken, in Germany, likewise purported to grant to plaintiff the right to make and vend the phonograph records in the United States. Plaintiff likewise proceeded to make and vend the records in the United States. Defendant is making and vending the records in the United States.

■■ Under the law of New York, the owner of literary property may, by a negative covenant, subject the use of literary property to restrictions in the hands of a remote assignee. Murphy v. Christian Press Ass'n Pub. Co., 38 App. Div. 426, 56 N.Y.S. 597, per Cullen, J. Defendant cannot, therefore, claim rights to make and vend the records outside of Czechoslovakia.

■ Plaintiff must, however, succeed on the strength of its own title rather than the weakness of defendant's. Did Telefunken's grant vest any rights in plaintiff? The New York rule that literary property may be subjected to restrictions in the hands of a remote assignee presupposes the effectiveness of an assignment of literary property.

Here both the assignment and the restriction to the United States were valid.

Granting that plaintiff was in the beginning vested with the right to make and vend the records in the United States, was that right lost as soon as plaintiff sold the first records? In RCA Mfg. Co. v. Whiteman, 2 Cir., 114 F.2d 86, 88, 89, supra, this court stated that the common-law property in the performances of musical artists which had been recorded ended with the sale of the records and that thereafter anyone might copy them and use them as he pleased. If that is the law, plaintiff has no more right to demand that defendant cease its unauthorized making and vending than has the merest interloper.

■ Our conclusion is that the quoted statement from the RCA case is not the law of the State of New York. Since its decision the New York courts have had close contact with the question in Metropolitan Opera Ass'n v. Wagner-Nichols Recorder Corp., 199 Misc. 786, 101 N.Y.S.2d 483; Id., 279 App.Div. 632, 107 N.Y.S.2d 795. We believe that the inescapable result of that case is that, where the originator, or the assignee of the originator, of records of performances by musical artists puts those records on public sale, his act does not constitute a dedication of the right to copy and sell the records.

In the Metropolitan Opera case the Metropolitan Opera Association had purported to grant to the American Broadcasting Company the exclusive right to broadcast its performances, and to Columbia Records, Inc., the exclusive right to make and vend records of its performances. Defendant Wagner-Nichols Recorder Corporation, without obtaining any consent, made and sold records of the broadcasts. The Appellate Division, affirming the Special Term, held that this constituted unfair competition and upheld a complaint seeking an injunction in favor of Metropolitan Opera and Columbia. As appears from the record on appeal, Columbia had recorded opera performances which were specially rendered and not broadcast and had placed on the market the records so made. Two of the operas thus recorded by Columbia were among the ones performances of which were caught by defendant from the broadcasts and recorded and sold. It is to be noted that, in spite of the fact that Columbia had sold recordings of these two operas, it was held to be entitled to an injunction against the sale by defendant of recordings of the same two operas made by intercepting the broadcasts.

If the view of the New York courts had been that Columbia had dedicated to the public the right to copy the records of those two performances, the injunction against the defendant's sale of recordings of performances of the same two operas would have left the world at large free to copy the two performances from Columbia records. That could not have been the intention of the New York courts. It would be capricious to enjoin at Columbia's suit sale of records made from the broadcasts of operas while the copying of Columbia's records of the same operas and the sale of the copies thus made were open to all the world. The damage wrought by the sale of records made from broadcasts would be so little greater than the incompensable damage already suffered as a result of the dedication that the difference would not support a plea for an injunction. The fact that the New York courts, in the case of the two operas which had already been the subject of records sold by Columbia, made no exception and prohibited the sale of recordings of them along with the rest indicates that the New York courts' view was that Columbia's sale of the records of the two operas did not put in the public domain the right to copy them and sell the copies.

■ We thus conclude that plaintiff has not lost the exclusive right to make and sell the records in the United States.

■ Defendant says that this court ought not to recognize any rights in plaintiff because the recordings were made under contracts containing Nazi racial provisions which offend our public policy.

Our public policy does not go so far as to outlaw the products of an economy from which persons are excluded on racial grounds.

 A further point urged is that the decree is void because of the absence of necessary parties, Telefunken and defendant's predecessor in title in Czechoslovakia. It is true that they cannot be bound by a decree obtained in their absence and that some of the issues here may have to be relitigated between them and defendant with possibly divergent results. Nevertheless that does not make it impossible to determine the controversy as between this plaintiff and defendant in their absence. Hence they are not necessary parties.

Defendant complains that it has been enjoined from selling eight out of the thirty-four records involved without the presentation of the appropriate contract between the artist and Telefunken. Judge Leibell found that it could not be disputed that the recordings were made for Telefunken by the artists. We agree.

Affirmed.

L. HAND, Circuit Judge (dissenting).

I also believe that the performance or rendition of a "musical composition" is a "Writing" under Article I, § 8, Cl. 8 of the Constitution separate from, and additional to, the "composition" itself. It follows that Congress could grant the performer a copyright upon it, provided it was embodied in a physical form capable of being copied. The propriety of this appears, when we reflect that a musical score in ordinary notation does not determine the entire performance, certainly not when it is sung or played on a stringed or wind instrument. Musical notes are composed of a "fundamental note" with harmonics and overtones which do not appear on the score. There may indeed be instruments—e. g. percussive—which do not allow any latitude,

though I doubt even that; but in the vast number of renditions, the performer has a wide choice, depending upon his gifts, and this makes his rendition pro tanto quite as original a "composition" as an "arrangement" or "adaptation" of the score itself, which § 1(b) makes copyrightable. Now that it has become possible to capture these contributions of the individual performer upon a physical object that can be made to reproduce them, there should be no doubt that this is within the Copyright Clause of the Constitution.

That, however, does not answer the question whether Congress has protected this "common-law property" by copyright; and I am also disposed to believe that it has not done so. Section 4, if read literally, would leave no doubt that the Act covers all that can constitutionally be copyrighted; and it has been so assumed on occasions where the statute did not elsewhere disclose an opposite intent.[1] But we in RCA Mfg. Co. v. Whiteman, 2 Cir., 114 F.2d 86, 89, and the Supreme Court of Pennsylvania in Waring v. WDAS Broadcasting Station, Inc., 327 Pa. 433, 194 A. 631, said that records such as those at bar could not be copyrighted; although it is true that in neither case was that strictly necessary to the actual decision. The House report on the Act of 1909 does not, however, seem to me to throw any light upon the issue, for, in the passage relied upon, the report was concerned only with § 1(e), which was intended to overrule White-Smith Music Publishing Company v. Apollo Company, 209 U.S. 1, 28 S.Ct. 319, 52 L.Ed. 655. That decision had held that under the existing statute mechanical reproductions of the score of a musical composition were not infringements of the composer's copyright; but those reproductions were not of any contribution of a performer; and therefore the only effect of § 1(e) was to give a limited protection to the existing copyright of the score from this kind of in-

---

1. International News Service v. Associated Press, 248 U.S. 215, 234, 39 S.Ct. 68, 63 L.Ed. 211; Deutsch v. Arnold, 2 Cir., 98 F.2d 686; Reiss v. National Quotation Bureau, Inc., D.C.S.D.N.Y., 276 F. 717.

fringement. I cannot find in the language of the report anything even to intimate that the record of a performer of a "musical composition" should not be copyrighted; for, if copyrighted, such records would be themselves the "works," not infringements of another "work": i. e. the score. The second quotation from the report—i. e. that touching § 4 itself,—was addressed only to the choice of the word "Writings," as against "works," and was limited to leaving unchanged the decisions of court. Since I cannot see anything in the report that bears on the question of the copyrightability of the records at bar, I need not consider how far I should deem it controlling in interpreting the language of § 4.[2] Nor am I impressed, either with the Register's refusal in 1935 to accept an application for copyright of the "personal interpretation of Fred Waring"; or by the argument that such records could not be marked with the notice required by § 10, or deposited for registration as required by § 11.

Nevertheless, the considerations put forward by Professor Chafee in his "Reflections on Copyright Law,"[3] have convinced me that the absolute language of § 4 should not be taken to apply to "common-law property" of the kind here at bar. My reasons for this are that to do so would be too much to ignore the very specific provisions of § 1(e) regulating the infringement of "musical compositions" by "mechanical reproduction." The kind of "common-law property" now before us is very close aboard the sort of thing that Congress was dealing with in § 1(e); and the way that it did deal with it strongly implies that this kind of copyright requires special treatment. More concretely I mean this. Although Congress meant to depart from the existing denial of mechanical infringement of "musical compositions," and to adopt

in general the view of the concurring opinion of Holmes, J., in White-Smith Music Publishing Company v. Apollo Company, supra, 209 U.S. 1, 28 S.Ct. 319, it did not choose to make mechanical reproductions infringements in the ordinary sense. Obviously, it thought that this kind of invasion of the composer's property demanded only a limited remedy, which it specifically prescribed: two cents for each record. If we were to hold that records made of the renditions of a singer or a virtuoso were copyrightable, this limitation could scarcely be imported into their infringement, which in its absence would therefore carry the same remedies as any other infringement. That, I agree, we should have no right to assume. True, it is a serious matter to impose implied limitations upon the words of a statute that apparently express the deliberate purpose of exercising a constitutional power to its full scope; nevertheless, this appears to me to be an occasion when we are forced to do so, and for that reason I think that the records of Telefunken, though they are "Writings" under the Constitution, could not have been copyrighted under the Act.

However, the question at bar is not whether the plaintiff can prevent the plagiarism of its records by the defendant as a copyright infringement; but whether by their public sale it has lost its "common-law property" in the renditions of the songs. It got from Telefunken all rights that Telefunken had in the matrices and records made in Germany, and I will assume that these included any rights that the singers may have had in the renditions. If the question is to be decided by the law of New York, where the records were sold, again I agree that the decision of the Supreme Court in Metropolitan Opera Ass'n v. Wagner-Nichols Recorder Corp., 199

2. Railroad Commission of State of Wisconsin v. Chicago, B. & Q. R. Co., 257 U.S. 563, 589, 42 S.Ct. 232, 66 L.Ed. 371; United States v. Shreveport Grain & Elevator Co., 287 U.S. 77, 83, 53 S.Ct. 42, 77 L.Ed. 175; Gemsco, Inc., v. Walling, 324 U.S. 244, 260, 65 S.Ct. 605, 89 L. Ed. 921; Packard Motor Car Co. v. National Labor Relations Board, 330 U.S. 485, 492, 67 S.Ct. 789, 91 L.Ed. 1040; Ex parte Collett, 337 U.S. 55, 61, 69 S. Ct. 944, 959, 93 L.Ed. 1207.

3. 45 Columbia Law Review 733-736.

Misc. 786, 101 N.Y.S.2d 483, affirmed by the Appellate Division for the First Department in 279 App.Div. 632, 107 N.Y. S.2d 795, is conclusive upon us. In that case the intervening plaintiff, Columbia Records, had a contract with the opera company which allowed it to make recordings of three operas produced by that company and to sell the records so made to the public. The defendant made matrices from broadcasts of the operas by the American Broadcasting Company under another contract with the opera company. The defendant made and sold records from these matrices, which the court enjoined on the theory that the sales were "unfair competition." If the records had been copyrightable under the Act, there could be no doubt that publication would have been a dedication of any common-law right. In Fashion Originators Guild v. Federal Trade Commission, 2 Cir., 114 F.2d 80, 83, 84, we held that this was true of "'common-law property'" in the designs for women's dresses, which was within the Copyright Clause of the Constitution, although we did not consider whether the "designs could be registered or not," because "'publication' of them was a surrender of all its," the owner's, "'common-law property' in them." It is true that when our order was affirmed by the Supreme Court, 312 U.S. 457, at page 468, 668, 61 S.Ct. 703, at page 708, 85 L. Ed. 949, the opinion contained the following passage: "Nor can the unlawful combination be justified upon the argument that systematic copying of dress designs is itself tortious, or should now be declared so by us. In the first place, whether or not given conduct is tortious is a question of state law, under our decision in Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188. In the second place, even if copying were an acknowledged tort under the law of every state, that situation would not justify petitioners in combining together to regulate and restrain interstate com-

merce in violation of federal law." This might indeed be read as holding that the state law should decide whether the "author" had lost his "common-law property" by "publication"; but that was not necessary to the decision, and in any event the Court did not have in mind the effect of the Copyright Clause or the Copyright Act. Moreover, although in RCA Mfg. Co. v. Whiteman, supra, 2 Cir., 114 F.2d 86, we decided the same question freed from the factor of the Anti-Trust Act, the Court had granted certiorari in Fashion Originators Guild v. Federal Trade Commission, 311 U.S. 641, 61 S.Ct. 175, 85 L.Ed. 409, only three weeks before it denied the writ in RCA Mfg. Co. v. Whiteman, supra. Hence I do not think that we should consider Fashion Originators Guild v. Federal Trade Commission, supra, 312 U.S. 457, 668, 61 S.Ct. 703, as a ruling that it is the state law that determines what "publication" destroys the "common-law property" in a "Writing" not copyrightable under the Act. We did not indeed have to say what law governed that question in either Fashion Originators Guild v. Federal Trade Commission, supra, or RCA Mfg. Co. v. Whiteman, supra, for we had no reason to anticipate that the law of New York would take a different view; and, for that matter, the decision in the Metropolitan Opera case itself was made without any notion that a federal question might be involved.

If § 2 of the Act were the sole basis of all rights that are within the Copyright Clause, there could have been no doubt that "publication" would be a federal question, for the section is limited to "unpublished" works. However, it is the successor of R.S. § 4967, which was itself the successor of § 9 of the Act of February 3, 1831, 4 Stat. 438, and it is settled that that section only granted a remedy cumulative upon the state remedies and is not the basis of the author's "common-law property." [4] I therefore recognize the plausibility of

4. Press Publishing Company v. Monroe, 2 Cir., 73 F. 196, 31 L.R.A. 353, appeal dismissed on the ground that no federal question was involved, 164 U.S. 105, 17 S. Ct. 40, 41 L.Ed. 367; Palmer v. De Witt, 47 N.Y. 532.

the possible argument that, since § 2 was not necessary to avoid the judges' answer to the third question in Donaldson v. Becket, 4 Burrows 2408, the courts of New York should be deemed free, sub nomine "unfair competition," to determine what conduct shall constitute a "publication" of a "work" not covered by the Copyright Act. It would then follow that they could grant to an author a perpetual monopoly, although he exploited the "work" with all the freedom he would have enjoyed, had it been copyrighted. I cannot believe that the failure of Congress to include within the Act all that the Clause covers should give the states so wide a power. To do so would pro tanto defeat the overriding purpose of the Clause, which was to grant only for "limited Times" the untrammelled exploitation of an author's "Writings." Either he must be content with such circumscribed exploitation as does not constitute "publication," or he must eventually dedicate his "work" to the public. The situation is no different from that of patents, where such bilateral character of the grant is a commonplace. I would hold that the clause has that much effect ex proprio vigore; and that the states are not free to follow their own notions as to when an author's right shall be unlimited both in user and in duration. Such power of course they have as to "works" that are not "Writings"; but I submit that, once it is settled that a "work" is in that class, the Clause enforces upon the author the choice I have just mentioned; and, if so, it must follow that it is a federal question whether he has published the "work."

Moreover, there is another reason for this conclusion. Uniformity was one of the principal interests to be gained by devolving upon the Nation the regulation of this subject. During the existence of the Articles of Confederation several of the states had passed copyright laws, largely through the efforts of Noah Webster; and on May 2, 1783, Madison had procured the passage of a resolution through Congress recommending the states to pass such a law. By 1786 all but Vermont had done so,[5] although in several states the statute did not protect citizens of states that did not reciprocate; and so the matter stood in 1787. So far as I know, there is nothing to show what took place in the Convention; but, in the 43rd number of the Federalist, Madison made this short comment on the Clause, "The States cannot separately make effectual provision for either of these cases" (patents or copyrights), "and most of them have anticipated the decision of this point, by laws passed at the instance of Congress." He assumed that it was obvious that the states could not make any such "effectual provision," and so it was; for, although a state may prohibit the importation of pirated "works" published elsewhere, and even confiscate them, that has again and again proved an ineffective protection; and was indeed a principal cause of international reciprocity by treaty. If, for example in the case at bar, the defendant is forbidden to make and sell these records in New York, that will not prevent it from making and selling them in any other state which may regard the plaintiff's sales as a "publication"; and it will be practically impossible to prevent their importation into New York. That is exactly the kind of evil at which the clause is directed. I recognize that under the view I take the plaintiff can have only a very limited use of its records, if it hopes to keep its monopoly. That is indeed a harsh limitation, since it cannot copyright them; but I am not satisfied that the result is unjust, when the alternative is a monopoly unlimited both in time and in user. Unhappily we cannot deal with the situation as we should like, because the copyrightability of such "works" is a casus omissus from the Act. That was almost certainly owing to the fact that in 1909 the practise of recording the renditions of virtuosi had not sprung up.

Therefore I would reverse the judgment as to all records that the plaintiff

---

5. Drone on Copyright, pp. 87, 88; Bowker on Copyright, p. 35.

has sold in this country and dismiss the complaint, so far. As to any records that it has not sold here, if there be such, their status does not appear on this record with enough certainty to dispose of the appeal. I cannot find out whether Telefunken had any "common-law property" in them in Germany, or, if it had, whether it was lost by sale in that country. We do not know what is the German law; nor has the question been argued whether the same conduct occurring in another country that would constitute a "publication" in the United States, would bring the "work" into the public demesne here if it did not forfeit the right by the law of the country where it took place. Since my view is not to prevail, I need not consider any of these questions, and I express no opinion on them.