# Supreme Court of Florida

_____

No. SC16-1161
_____

**FLO & EDDIE, INC., etc.,**
Appellant,

vs.

**SIRIUS XM RADIO, INC., etc.,**
Appellee.

[October 26, 2017]

CANADY, J.

This Court has for review four questions of Florida law certified by the

United States Court of Appeals for the Eleventh Circuit in a copyright dispute

involving the satellite-radio broadcasting of certain "pre-1972" sound recordings.[1]

_____

1. For purposes of convenience, we use the term "pre-1972" sound recordings to refer to those sound recordings that were recorded—that is, "fixed"—prior to February 15, 1972. And we refer to sound recordings fixed on or after that date as "post-1972" sound recordings. That date is relevant because post-1972 sound recordings fall within the exclusive realm of federal copyright protection, whereas pre-1972 sound recordings receive no federal copyright protection at all. See 17 U.S.C. § 301(c). Congress left it to the States to regulate pre-1972 sound recordings and to provide "any rights or remedies under the common law or statutes . . . until February 15, 2067." Id.

This Court has jurisdiction. See art. V, § 3(b)(6), Fla. Const. The dispute in this case concerns rights in sound recordings of performances of musical works as distinct from rights in the composition of such works. The crucial question presented is whether Florida common law recognizes an exclusive right of public performance in pre-1972 sound recordings. We conclude that Florida law does not recognize any such right and that Flo & Eddie's various state law claims fail.

## I. BACKGROUND AND CERTIFIED QUESTIONS

Appellant/plaintiff, Flo & Eddie, Inc. ("Flo & Eddie"), is a California corporation that owns the master sound recordings of certain pre-1972 musical performances by The Turtles. Flo & Eddie, Inc. v. Sirius XM Radio, Inc., 827 F.3d 1016, 1018 (11th Cir. 2016).[2] Appellee/defendant, Sirius XM Radio, Inc. ("Sirius"), is a satellite and internet radio provider that operates a nationwide broadcast service. Id. Flo & Eddie has never licensed Sirius to play Turtles recordings, and Sirius broadcasts Turtles songs to Sirius's subscribers in Florida without paying any royalties to Flo & Eddie. Id. As part of its digital music broadcast service, Sirius creates certain "back-up" and "buffer" copies of recordings on its servers and satellites. Id. A description of those copies is set

---

2. The sound recordings at issue include the iconic hit "Happy Together." Flo & Eddie, 827 F.3d at 1022.

- 2 -

forth in the district court's opinion.  See Flo & Eddie, Inc. v. Sirius XM Radio, Inc., No. 13-23182-CIV, 2015 WL 3852692, at *1 (S.D. Fla. June 22, 2015).

Flo & Eddie brought suit against Sirius in federal district court in Florida on September 3, 2013, claiming that Sirius's broadcasting of Turtles songs constitutes unauthorized public performances of the recordings and that Sirius's back-up and buffer copies constitute unauthorized reproductions of the recordings.[3]  Flo & Eddie, 827 F.3d at 1018.  Flo and Eddie alleged the following four causes of action under Florida law: (1) common law copyright infringement; (2) common law misappropriation and unfair competition; (3) common law conversion; and (4) civil theft under section 772.11, Florida Statutes, for violations of section 812.014(1), Florida Statutes.  Id. at 1018-19.  On July 15, 2014, Sirius moved for summary judgment on liability.  Id. at 1019.  After a hearing, the district court granted Sirius's motion for summary judgment on all claims.  Id.

## A.  The District Court

After noting that States are free to regulate pre-1972 sound recordings and that the Florida Statutes do not directly address these issues, the district court

---

3. Flo & Eddie brought similar suits against Sirius in California, see Flo & Eddie Inc. v. Sirius XM Radio Inc., No. CV 13-5693 PSG RZx, 2014 WL 4725382 (C.D. Cal. Sept. 22, 2014), and in New York, see Flo & Eddie, Inc. v. Sirius XM Radio, Inc., 62 F. Supp. 3d 325 (S.D.N.Y. 2014), rev'd, 849 F.3d 14 (2d Cir. 2017).

looked to Florida's common law and separately analyzed the copyright issues of public performance and reproduction. Flo & Eddie, 2015 WL 3852692, at *3-6.

As to the exclusive right of public performance, the district court concluded that no such right exists under Florida common law. Id. at *5. The district court noted that there was no Florida case law directly on point and that there was very little Florida case law interpreting common law copyright related to the arts in general.[4] Id. at *4. The district court thus determined that it was being asked to "creat[e] a new property right in Florida" and declined to do so, concluding that such a task was a legislative one. Id. at *5. The district court also noted that many unanswered questions would result from the recognition of such a new right—issues such as ownership, royalty administration, exceptions, and other stakeholders. Id.

As to the right of reproduction, the district court implicitly assumed that Florida common law recognizes a pre- and post-sale right of reproduction for pre-1972 sound recordings and then concluded that Sirius's back-up and buffer copies "do not constitute an improper reproduction." Id. at *6. The district court found that "none of the buffer or back-up copies are maintained by Sirius or accessible to

---

4. The district court noted that the only case to which Flo & Eddie cited that interpreted Florida law was CBS, Inc. v. Garrod, 622 F. Supp. 532 (M.D. Fla. 1985), a case that "relied extensively on New York law" and that did not address the issue of public performance rights. Flo & Eddie, 2015 WL 3852692, at *4.

the public. They are discarded immediately after use. In addition, the buffer copies are not full length copies of the recording." Id. In concluding that Sirius did not unlawfully reproduce the sound recordings, the district court cited two decisions from the Second Circuit for the proposition that buffer copies do not constitute copyright infringement. Id. (citing Cartoon Network, LP v. CSC Holdings, Inc., 536 F.3d 121, 127-30 (2d Cir. 2008), and Authors Guild v. Hathi Trust, 755 F.3d 87, 97-99 (2d Cir. 2014)).

After determining that Flo & Eddie's common law copyright claims failed, the district court then summarily dismissed Flo & Eddie's remaining non-copyright claims—for common law misappropriation and unfair competition, common law conversion, and civil theft—on the basis that they were all dependent on the copyright claim. Id.[5]

## B. The Eleventh Circuit

On appeal, the Eleventh Circuit found the existence of "significant doubt" regarding answers to the material questions of Florida law upon which the case turns. Flo & Eddie, 827 F.3d at 1025. As to the exclusive right of public

---

5. Although the district court granted summary judgment in favor of Sirius, the district court nevertheless addressed an argument raised by Sirius regarding the Dormant Commerce Clause, concluding that any state regulation of pre-1972 recordings would not violate the Dormant Commerce Clause, given that Congress specifically authorized the States to regulate pre-1972 recordings. Flo & Eddie, 2015 WL 3852692, at *6.

performance, the Eleventh Circuit examined this Court's decision in <u>Glazer v. Hoffman</u>, 16 So. 2d 53 (Fla. 1943), and ultimately expressed uncertainty regarding the potential application of <u>Glazer</u> to the instant case. <u>Flo & Eddie</u>, 827 F.3d at 1020-22.

In <u>Glazer</u>, Charles Hoffman, a magician/entertainer, sought a permanent injunction against Maurice Glazer, another magician/entertainer, alleging infringement of common law copyright, among other things. <u>Glazer</u>, 16 So. 2d at 53-55. In the complaint it was alleged that, among other things, Glazer imitated several acts and performances that were the "result of great labor, time and efforts." <u>Id.</u> at 53-54. The acts and performances generally involved using certain mechanical equipment to produce various types of drinks for the audience members through "sleight of hand performance." <u>Id.</u> at 54. Glazer argued that he did not attempt to deceive the public into thinking his performance was like Hoffman's, and that the drink performance was the common property of all magicians because it was merely an old sleight of hand trick. <u>Id.</u> This Court concluded that the performance was "not such a dramatic composition as to bring it within the meaning of the" federal copyright statutes. <u>Id.</u> at 55. This Court then addressed the "asserted common law property right" in and to the performance, concluding that Hoffman's performing of the tricks in front of many audiences over the years constituted a publication and a dedication to the public such that the

- 6 -

tricks "became the property of the general public, and [Glazer] had a lawful right to use the same." Id.

Here, the Eleventh Circuit noted that Glazer could be read to mean that Florida may recognize a common law copyright in sound recordings, which, "no less than magic tricks, are 'intellectual productions,' " Flo & Eddie, 827 F.3d at 1021 (quoting Glazer, 16 So. 2d at 55), while noting that Glazer could also be read to mean that any such common law copyright is extinguished at the moment of "publication" or dedication to the public, which could include the public distribution and sale of phonorecords under the facts of this case, id. at 1021-22.[6]

After concluding that Florida law was unclear regarding the existence of an exclusive public performance right, the Eleventh Circuit then analyzed whether

_____

6. The Eleventh Circuit also noted that Glazer referenced Waring v. WDAS Broadcasting Station, 194 A. 631 (Pa. 1937), in which the Supreme Court of Pennsylvania held that a plaintiff orchestra had a common law right of performance that could be enforced in equity to prohibit a defendant radio station from publicly broadcasting a lawfully purchased recording of the orchestra's musical performance. Flo & Eddie, 827 F.3d at 1021 (discussing Waring, 194 A. at 634-35).

The Eleventh Circuit also examined the New York Court of Appeals' decision in Capitol Records, Inc. v. Naxos of America, Inc., 830 N.E.2d 250 (N.Y. 2005), and concluded that "[u]nder New York common law, the public sale of a sound recording is not a general publication that ends common law copyright protection." Flo & Eddie, 827 F.3d at 1022-23. We note that the New York Court of Appeals recently distinguished Naxos (and certain other cases addressing New York common law) as involving solely the right of reproduction, holding that New York common law "does not recognize a right of public performance for creators of sound recordings." Flo & Eddie, Inc. v. Sirius XM Radio, Inc., 70 N.E.3d 936, 937 (N.Y. 2016).

Florida law recognizes an exclusive right of reproduction. Id. at 1023-24. The Eleventh Circuit noted that CBS, Inc. v. Garrod, 622 F. Supp. 532 (M.D. Fla. 1985), provided some support for the conclusion that Florida common law recognizes such a right.[7] Flo & Eddie, 827 F.3d at 1023-24; see also id. at 1023 n.5. The Eleventh Circuit also noted as potentially relevant the fact that Florida has a criminal record piracy statute and that the statute contains an exception for radio broadcasters. Id. at 1024 (citing § 540.11, Fla. Stat.). Finally, in reviewing the district court's conclusion that Sirius's buffer and back-up copies were non-infringing, the Eleventh Circuit observed that the two Second Circuit decisions relied on by the district court—Cartoon Network and Authors Guild—relied extensively on analyses of the Federal Copyright Act. Id. The Eleventh Circuit expressed uncertainty as to whether Florida common law would support the same analysis and conclusion regarding Sirius's buffer and back-up copies, even assuming—as the district court did—that Florida common law otherwise recognizes a right of reproduction that is not divested by publication. Id.

---

7. In Garrod—a record piracy case—the federal district court in Florida concluded that distribution of records does not result in the loss of "common law copyright." Garrod, 622 F. Supp. at 535.

Concerning Flo & Eddie's remaining non-copyright claims, the Eleventh Circuit determined that Florida law was unclear whether these claims "may lie in the absence of an enforceable copyright." Id. at 1024-25.

Consequently, the Eleventh Circuit certified to this Court the following four questions of Florida law:

> 1. Whether Florida recognizes common law copyright in sound recordings and, if so, whether that copyright includes the exclusive right of reproduction and/or the exclusive right of public performance?
>
> 2. To the extent that Florida recognizes common law copyright in sound recordings, whether the sale and distribution of phonorecords to the public or the public performance thereof constitutes a "publication" for the purpose of divesting the common law copyright protections in sound recordings embedded in the phonorecord and, if so whether the divestment terminates either or both of the exclusive right of public performance and the exclusive right of reproduction?
>
> 3. To the extent that Florida recognizes a common law copyright including a right of exclusive reproduction in sound recordings, whether Sirius's back-up or buffer copies infringe Flo & Eddie's common law copyright exclusive right of reproduction?
>
> 4. To the extent that Florida does not recognize a common law copyright in sound recordings, or to the extent that such a copyright was terminated by publication, whether Flo & Eddie nevertheless has a cause of action for common law unfair competition / misappropriation, common law conversion, or statutory civil theft under Fla. Stat. § 772.11 and Fla. Stat. § 812.014?

Id. at 1025.[8]

## C. Combined and Rephrased Certified Question

We conclude that this controversy turns on the threshold question of whether

Florida common law recognizes an exclusive right of public performance in

pre-1972 sound recordings.  Consequently, we combine and then rephrase the first

two certified questions into the following determinative question:

> Does Florida common law recognize the exclusive right of public
> performance in pre-1972 sound recordings?

We first explain why we answer the combined and rephrased question in the

negative.  We then briefly address the remaining two questions of Florida law

certified by the Eleventh Circuit.

## II.  ANALYSIS

As noted by the district court and the Eleventh Circuit, there is no Florida

case law specifically addressing Florida common law copyright in the context of

sound recordings.  But the issue of copyright for sound recordings—including

public performance rights—has a long and well-documented history in this

country, under both federal law and Florida law.  Consequently, we first explore

that history and then explain its relevance to our conclusion that Florida common

---

8. The Eleventh Circuit also reserved judgment on the district court's
conclusion regarding the Dormant Commerce Clause.  Flo & Eddie, 827 F.3d at
1026 n.8.  We do not address this issue.

law does not recognize an exclusive right of public performance in pre-1972 sound recordings.

## A. Copyright for Sound Recordings—Federal Law

As recognized by the Eleventh Circuit, "sound recordings . . . are to be distinguished from music compositions, i.e., the actual notation of the musical notes on a page." Flo & Eddie, 827 F.3d at 1019 n.2; see also Brian T. Yeh, Cong. Research Serv., RL33631, Copyright Licensing in Music Distribution, Reproduction, and Public Performance 2-3 (2015) (noting the distinction under federal copyright law between "musical works" and "sound recordings"). Musical compositions have been protected by federal copyright law since 1831. See Act of Feb. 3, 1831, ch. 16, § 1, 4 Stat. 436 (granting the author of a "musical composition . . . the sole right and liberty of printing, reprinting, publishing and vending such . . . musical composition"). And in 1909, Congress expanded that federal copyright protection for musical compositions by granting the copyright owners the exclusive right "[t]o perform the [musical composition] publicly for profit." Act of March 4, 1909, Pub. L. No. 60-349, § 1(e), 35 Stat. 1075. Thus, the owner of the copyright in the composition (oftentimes the songwriter or publisher) has long been entitled to receive royalties whenever the musical work is played on the radio, whether that be terrestrial radio or, more recently, satellite radio.

- 11 -

Historically, the performing artist who recorded the song (or the record company), however, was <u>not</u> entitled to a separate federal copyright for the sound recording and thus did not receive any royalties when the recorded song was played on the radio. For decades, record companies and artists sought to change that result. Numerous bills were introduced over the years that would have provided a performance right for sound recordings, but those bills all failed. <u>See, e.g.</u>, H.R. 10632, 74th Cong. (1936); H.R. 7173, 77th Cong. (1942); H.R. 1270, 80th Cong. (1947); <u>see also</u> Linda A. Newmark, <u>Performance Rights in Sound Recordings: An Analysis of the Constitutional, Economic, and Equitable Issues</u>, 38 ASCAP Copyr. L. Symp. 141, 142 n.9 (1992) (listing more than twenty failed bills between 1936 and 1981). In fact, up until 1971, Congress declined to provide <u>any</u> form of federal copyright protection to sound recordings.

In 1971—in an apparent response to the rise of record piracy—Congress extended federal copyright protection to sound recordings for the very first time in the Sound Recording Act of 1971 (Act of 1971), Pub. L. No. 92-140, § 1, 85 Stat. 391. But this new copyright protection was "limited" and focused exclusively on the right to "reproduce and distribute to the public . . . reproductions of the . . . sound recording." <u>Id.</u> And one of the exceptions to this limited new right was for "reproductions made by transmitting organizations exclusively for their own use." <u>Id.</u> The Act of 1971 did <u>not</u> grant the sound recording owner an exclusive right of

- 12 -

public performance. Thus, under federal law, the playing of a sound recording over the radio continued to require only one license—from the copyright owner of the musical work. The Act of 1971 only applied to those sound recordings "fixed, published, and copyrighted" on or after February 15, 1972, which was the effective date of the Act of 1971. Id. § 3, 85 Stat. 392; see also 17 U.S.C. § 301(c). Although pre-1972 sound recordings did not come within the purview of the Act of 1971, Congress did make clear that it was not preempting any state protections for pre-1972 sound recordings. See Act of 1971, § 3, 85 Stat. 392 (noting that nothing in the Act of 1971 or in title 17, United States Code, "shall be . . . construed as affecting in any way any rights with respect to sound recordings fixed before [February 15, 1972]"); see also Goldstein v. California, 412 U.S. 546, 571 (1973) ("Congress has indicated neither that it wishes to protect, nor to free from protection, recordings of musical performances fixed prior to February 15, 1972.").

In 1976, Congress amended title 17 of the United States Code in its entirety, largely bringing all of copyright law under the federal umbrella.[9] See Act of Oct. 19, 1976 (Act of 1976), Pub. L. No. 94-553, § 101, 90 Stat. 2541, 2544-45. Regarding sound recordings, the Act of 1976 made two things clear. First, States remained free to provide statutory or common law protections for all pre-1972

_____

9. United States copyright law was codified as title 17 of the United States Code on July 30, 1947.

- 13 -

sound recordings, until February 15, 2047.[10] Id. § 101, 90 Stat. 2572 (amending 17 U.S.C. § 301(c)). Second, for those sound recordings covered by federal copyright protection, that protection specifically did not include an exclusive right of public performance. Id. § 101, 90 Stat. 2560 (amending 17 U.S.C. § 114(a)). The Act of 1976 went into effect on January 1, 1978. Id. § 102, 90 Stat. 2598-99.

In 1995—in an apparent response to the rise of certain digital technologies—Congress expanded federal copyright protection for post-1972 sound recordings, granting them an exclusive right of public performance for the very first time. See Digital Performance Right in Sound Recordings Act of 1995 (Act of 1995), Pub. L. No. 104-39, 109 Stat. 336. But this new right was, again, limited—the new right only applied to the public performance of sound recordings "by means of a digital audio transmission." Id. § 2, 109 Stat. 336 (amending 17 U.S.C. § 106). As a result of the Act of 1995, under federal law, companies like Sirius now required two licenses to broadcast post-1972 sound recordings—that is, one from the owner of the musical composition and one from the owner of the sound recording—but continued to require only one license to broadcast pre-1972 sound recordings. And traditional AM/FM radio continued to require only one license to broadcast any

---

10. Congress later extended the future date for federal preemption of state regulation over pre-1972 sound recordings for an additional twenty years, until February 15, 2067. See Sonny Bono Copyright Term Extension Act, Pub. L. No. 105-298, § 102(a), 112 Stat. 2827 (1998).

- 14 -

sound recordings, whether pre-1972 or post-1972.  The Act of 1995 reflects

Congress's attempt at a balancing act of the various competing stakeholder

interests involved in this arena.  Namely, the Act of 1995 included, among other

things, a compulsory license scheme for companies that engage in the digital

transmission of sound recordings, a rate-setting mechanism, an exemption for

traditional radio, and a mandate for royalty sharing with the performers.  See

generally Act of 1995.

This relevant history shows that federal copyright law has long distinguished

the right of public performance from the right of reproduction and that up until

1995—when Congress granted a limited right of public performance for post-1972

sound recordings—Congress had repeatedly declined to recognize any right of

public performance for any sound recordings.

**B.  Copyright for Sound Recordings—Florida Law**

Although no Florida case law specifically addresses Florida common law

copyright in the context of sound recordings, the Florida Legislature has addressed

the issue of copyright for sound recordings on various occasions.  These legislative

measures in Florida were directly related to Congress's amendments to the federal

copyright laws, as well as to certain case law emanating from other jurisdictions,

namely, two cases that specifically addressed the issue of public performance

rights for sound recordings—Waring v. WDAS Broadcasting Station, Inc., 194 A.

- 15 -

631 (Pa. 1937), and <u>RCA Manufacturing Co. v. Whiteman</u>, 114 F.2d 86 (2d Cir. 1940).

In <u>Waring</u>, the Supreme Court of Pennsylvania identified but then declined to follow the "general American doctrine," under which the act of "publication" by the holder of certain common law property rights generally terminates those rights. <u>Waring</u>, 194 A. at 635-36. <u>Waring</u> involved a conductor of an orchestra filing suit to enjoin a radio station from broadcasting phonograph records of the orchestra performing its own artistic renditions of popular music. <u>Id.</u> at 632-33. The orchestra originally played in certain limited venues and eventually began to play over the radio, entering into a contract with the Ford Motor Company to broadcast on one night of the week. <u>Id.</u> The orchestra also started to make phonograph records for the Victor Talking Machine Company to sell to the public, but the records contained a label that read: "Not licensed for radio broadcast." <u>Id.</u> at 633. The defendant purchased a copy of the phonograph record and began playing it on the defendant's radio station. <u>Id.</u> <u>Waring</u> recognized that the case presented an issue of first impression. <u>Id.</u> at 632.

After recognizing that the sound recordings were not protected under federal copyright law, <u>id.</u> at 633, <u>Waring</u> concluded that the orchestra had a common law property right because the orchestra's productions met the test of "elevat[ing] interpretations to the realm of independent works of art," <u>id.</u> at 635. <u>Waring</u> then

- 16 -

addressed the issue of whether the orchestra should be considered to have lost its property interest through "publication"—the general rule in the realm of common law copyright. Id. at 635-36. Waring concluded that the restriction label affixed to the records was not unreasonable, id. at 638, and therefore resulted in only a "limited" or "qualified" publication as opposed to a "general" publication, id. at 636. Consequently, the orchestra could "enforce[] in equity" its public performance right as against the radio station. Id. at 638.[11]

In 1940, the Second Circuit Court of Appeals in Whiteman expressly disagreed with the Supreme Court of Pennsylvania's decision in Waring. Whiteman similarly involved an orchestra attempting to enjoin a radio station from broadcasting phonograph records of the orchestra's musical performances that were sold with the following restrictive legend: "Not Licensed for Radio Broadcast." Whiteman, 114 F.2d at 87. But Whiteman concluded that New York would follow the doctrine that any common law protection in the sound recordings "ended with the sale of the records." Id. at 88. Whiteman reasoned that to rule otherwise would be to effectively grant a perpetual monopoly to a work that was otherwise non-copyrightable under federal copyright law—a law which itself

---

11. Two years after Waring, a federal district court in North Carolina similarly concluded that the plaintiff orchestra could enjoin the defendant radio station from playing electrical transcriptions of its musical interpretations on the radio station. See Waring v. Dunlea, 26 F. Supp. 338 (E.D.N.C. 1939).

- 17 -

grants only a temporary monopoly to a copyrightable work in exchange for its dedication to the public. Id. at 89. Thus, Whiteman determined that any relief for sound recording owners must come from Congress, not from the courts. Id. ("Any relief which justice demands must be found in extending statutory copyright to such works . . . .").[12]

In the wake of Waring and Whiteman, the Florida Legislature enacted legislation aimed squarely at the issue of claimed public performance rights for sound recordings. See ch. 20868, Laws of Fla. (1941) (codified at §§ 543.02 and 543.03, Fla. Stat. (1941)). The new Florida law provided as follows:

> 543.02. **Common law rights abolished.**—When any phonograph record or electrical transcription, upon which musical performances are embodied, is sold in commerce for use within this state, all asserted common law rights to further restrict or to collect royalties on the commercial use made of any such recorded performances by any person are hereby abrogated and expressly repealed. When such article or chattel has been sold in commerce, any asserted intangible rights shall be deemed to have passed to the purchaser upon the purchase of the chattel itself, and the right to further restrict the use made of phonograph records or electrical

12. In 1955, the Second Circuit overruled Whiteman, but only in the context of the right of reproduction and distribution, holding that under New York common law, "where the [owner] of records of performances by musical artists puts those records on public sale, his act does not constitute a dedication of the right to copy and sell the records." Capitol Records, Inc. v. Mercury Records Corp., 221 F.2d 657, 663 (2d Cir. 1955); see also Flo & Eddie, 70 N.E.3d at 943 (concluding that Mercury Records overruled Whiteman, but solely in the context of anti-piracy). But concerning the right of public performance, Whiteman appears to have become the final judicial word in the period since 1940 until recent litigation by Flo & Eddie.

transcriptions, whose sole value is in their use, is hereby forbidden and abrogated.

543.03. **Rights under copyright laws unaffected.**—Nothing in § 543.02 or this section shall be deemed to deny the rights granted any person by the United States copyright laws. The sole intendment of this enactment is to abolish any common law rights attaching to phonograph records and electrical transcriptions, whose sole value is in their use, and to forbid further restrictions or the collection of subsequent fees and royalties on phonograph records and electrical transcriptions by performers who were paid for the initial performance at the recording thereof.

The enactment of this law indicates the Florida Legislature's intent to codify the "general American doctrine" that Waring acknowledged but declined to follow, see Waring, 194 A. at 635-36, and that Whiteman adopted, see Whiteman, 114 F.2d at 88.

Thirty years later, shortly before Congress passed the Act of 1971—which provided copyright protection to post-1972 sound recordings solely in the context of the right to "reproduce and distribute" reproductions of the recordings, see Act of 1971, § 1, 85 Stat. 391—the Florida Legislature enacted its own record piracy law, albeit a criminal one. See ch. 71-102, § 1, at 255-56, Laws of Fla. (codified at § 543.041, Fla. Stat. (1971)). The new Florida law—which made no distinction between pre- and post-1972 recordings—made it a crime to "[k]nowingly and willfully, without the consent of the owner," copy with the intent to sell or cause to be sold any sound recording on a "phonograph record, disc, wire, tape, film, or other article." Id. § 1, at 256. Additionally, the new law did not amend section

- 19 -

543.02, which continued to provide that the public sale of a sound recording extinguished any asserted common law rights to restrict the commercial use made of that recorded performance. Thus, like Congress, the Florida Legislature clearly viewed the issue of public performance rights for sound recordings as separate and distinct from the right of reproduction.

In 1977, shortly before the effective date of Congress's sweepingly preemptive Act of 1976, the Florida Legislature repealed almost all of chapter 543, Florida Statutes, including the common-law-divestiture provision in sections 543.02 and 543.03. See ch. 77-440, § 1, at 1802, Laws of Fla. The Florida Legislature did not, however, repeal the anti-piracy statute in section 543.041. Id. § 2, at 1802. Rather, the Legislature expanded the anti-piracy statute to, among other things, make it unlawful to "[k]nowingly and willfully, without the consent of the performer," copy performances "whether live before an audience or transmitted by wire or through the air by radio or television." Id. § 2, at 1803. In addition, the Legislature carved out certain exceptions to the criminal statute, including a specific exception for "any broadcaster who, in connection with or as part of a radio, television or cable broadcast transmission, or for the purpose of

archival preservation <u>transfers any such sounds recorded on a sound recording</u>."

<u>Id.</u> (emphasis added).[13]

### C. Answering the Combined and Rephrased Certified Question—Does Florida Common Law Recognize the Right of Public Performance for Pre-1972 Recordings?

Florida common law has never previously recognized an exclusive right of public performance for sound recordings. To recognize such a right for the first time today would be an inherently legislative task. Such a decision would have an immediate impact on consumers beyond Florida's borders and would affect numerous stakeholders who are not parties to this suit. The district court in this case recognized these concerns, <u>Flo & Eddie</u>, 2015 WL 3852692, at *5, as did the New York Court of Appeals when it recently answered a similar question certified by the Second Circuit in a suit brought by Flo & Eddie against Sirius in federal

---

13. The Legislature subsequently moved the record piracy statute to section 540.11, Florida Statutes—chapter 540, Florida Statutes, generally addresses commercial discrimination and unfair competition. The Legislature later amended the record piracy statute again, in 1989. <u>See</u> ch. 89-181, § 1, at 749-52, Laws of Fla. Among other things, the 1989 amendments made it unlawful to knowingly, willfully, and without the consent of the owner, copy sound recordings or performances with the intent to "use or cause to be used for profit through public performance" the article on which the sounds are transferred. <u>Id.</u> § 1, at 750. The Legislature also retained the exception for broadcasters, while adding certain new exceptions. <u>Id.</u> § 1, at 752. The Legislature has not amended the record piracy statute since 1989.

district court in New York based on the same conduct at issue in this case,[14] <u>Flo &</u>

<u>Eddie, Inc. v. Sirius XM Radio, Inc.</u>, 70 N.E.3d 936, 949-50 (N.Y. 2016).  Indeed,

in declining to recognize a right of public performance under New York common

law, the New York Court of Appeals noted that to recognize such a right would

have "extensive and far-reaching" consequences that would "upset settled

expectations" and impact the "many competing interests at stake."  <u>Flo & Eddie</u>,

70 N.E.3d at 949.  We agree.  Flo & Eddie essentially asks this Court to recognize

an unworkable common law right in pre-1972 sound recordings that is broader

than <u>any</u> right ever previously recognized in <u>any</u> sound recording.  Doing so would

require this Court to, among other things, ignore the lengthy and well-documented

history of this topic—something we decline to do.

As set forth above, since 1831, Congress has extended copyright protection

to the owner of the musical composition itself.  <u>See</u> Act of Feb. 3, 1831, ch. 16, §

1, 4 Stat. 436.  And since 1909, that copyright protection has included the

exclusive right of public performance.  <u>See</u> Act of March 4, 1909, Pub. L. No. 60-

349, § 1(e), 35 Stat. 1075.  Congress—over the course of several decades—then

---

14.  In Flo & Eddie's related New York suit, the Second Circuit determined that the case turned on "a significant and unresolved issue of New York law" and then certified the following question to the New York Court of Appeals: "Is there a right of public performance for creators of pre-1972 sound recordings under New York law and, if so, what is the nature and scope of that right?"  <u>Flo & Eddie, Inc. v. Sirius XM Radio, Inc.</u>, 849 F.3d 14, 16 (2d Cir. 2017).

repeatedly declined to provide any form of separate copyright protection for sound recordings. In 1971, Congress finally extended federal copyright protection to sound recordings, but only to post-1972 sound recordings, see Act of 1971, § 3, 85 Stat. 392, and solely with respect to record piracy, with an exception for "transmitting organizations" for their own use, id. § 1, 85 Stat. 391. It was not until the Act of 1995 that Congress finally granted a limited right of public performance that only applied to the public performance of post-1972 sound recordings "by means of a digital audio transmission." See Act of 1995, § 2, 109 Stat. 336 (amending 17 U.S.C. § 106).

Unlike the carefully delineated and limited right of public performance for post-1972 sound recordings that Congress eventually recognized in 1995 and circumscribed within the context of the various competing stakeholder interests, the Florida common law right sought by Flo & Eddie for pre-1972 sound recordings is unfettered. Thus, if this exclusive right of public performance has existed all along under the common law, then one would have to conclude that Congress actually took away that common law right for post-1972 recordings, on a going-forward basis, when enacting the Act of 1971—an act that recognized solely the right of reproduction in post-1972 sound recordings. See Act of 1971, § 1, 85 Stat. 391. And one would have to conclude that Congress then only partially restored that right when enacting the Act of 1995—an act that recognized the right

- 23 -

of public performance in post-1972 recordings, but only in the context of digital transmissions. See Act of 1995, § 2, 109 Stat. 336. We decline to reach the conclusion that, despite decades of industry lobbying, Congress eventually granted a right in 1972 that was significantly less valuable than the right Flo & Eddie claims has existed all along under the common law in Florida and elsewhere. Accepting Flo & Eddie's position would require that we ignore the lengthy history of this issue on the federal level.

As set forth above, certain legislative developments in Florida are also relevant to our conclusion. Flo & Eddie cites the Legislature's enactment of sections 543.02 and 543.03, Florida Statutes (1941)—which "expressly repealed" and "abolish[ed] any common law rights attaching to phonograph records"—as proof positive that Florida common law recognizes a common law right of public performance. Flo & Eddie argues that the Legislature would not have "abolished" those common law rights in 1941 had they not existed in the first place. We reject Flo & Eddie's arguments.

As an initial matter, at the time the Legislature enacted sections 543.02 and 543.03, there was no Florida case law that in any way recognized a common law right of public performance for sound recordings. The Legislature therefore was not addressing a recognized right under Florida common law. Instead, the Legislature's enactment of sections 543.02 and 543.03 in the wake of Waring and

- 24 -

Whiteman was designed to prevent common law from developing in Florida that would have recognized the exclusive right of public performance for sound recordings. The Legislature's use of the terms "repeal" and "abrogate" in sections 543.02 and 543.03 does not support a different conclusion. The Legislature simply used language similar to that used in legislation passed in other states to reject Waring. See, e.g., 1939 S.C. Acts 53. The operative language of the statute focuses on "all asserted common law rights." § 543.02, Fla. Stat. (1941) (emphasis added). No mention is made of "existing" or "established" common law rights.

Flo & Eddie also argues that when the Legislature subsequently repealed sections 543.02 and 543.03 in 1977, the effect of this repeal was to revive with full force and effect the prior existing common law that had been in place before the enactment of sections 543.02 and 543.03. In support of this proposition, Flo & Eddie cites Florida Fertilizer & Mfg. Co. v. Boswell, 34 So. 241, 242 (Fla. 1903) ("[W]hen a statute changing the common law is repealed, the common law is restored to its former state."), and North Shore Hospital, Inc. v. Barber, 143 So. 2d 849, 853 (Fla. 1962) (same). But Flo & Eddie's repeal argument is flawed in at least three respects.

First, as just explained, Florida common law had never recognized any exclusive right of public performance prior to the enactment of sections 543.02 and 543.03. Consequently, if anything, the repeal of those two sections would simply

restore Florida common law to its previous state—that is, the absence of any such common law right. Indeed, in Barber, this Court specifically looked to case law that "was decided prior to the enactment of the [subsequently repealed] statute." Barber, 143 So. 2d at 853 (emphasis added).

The second problem with Flo & Eddie's repeal argument is in its reliance on this Court's decision in Glazer. Flo & Eddie argues that in Glazer, "this Court expressly recognized the copyright principles embraced in the seminal and instructive Waring case." In certifying the questions of Florida law in this case, the Eleventh Circuit did not embrace Flo & Eddie's reading of Glazer, instead expressing uncertainty as to the potential application of Glazer to the instant case. Flo & Eddie, 827 F.3d at 1021-22. But in doing so, the Eleventh Circuit did note that Glazer contained a reference to Waring. Id. at 1021. We conclude that Glazer does not support the existence of a common law right of public performance for pre-1972 sound recordings.

As an initial matter, we note that Glazer did not adopt Waring. Instead, Glazer's lone reference to Waring was a bare recitation that Waring was one of approximately seven different cases relied on by the plaintiff in Glazer. See Glazer, 16 So. 2d at 55. Another problem with Flo & Eddie's reliance on Glazer is that Glazer was decided in 1943, after the enactment of sections 543.02 and 543.03. Thus, Glazer was not the common law that existed prior to the enactment

of those two sections. See Barber, 143 So. 2d at 853. Moreover, we do not read

Glazer as even applying to public performance rights for sound recordings, given

that sections 543.02 and 543.03 were in effect at the time Glazer was decided, and

Glazer itself specifically referenced chapter 543, Florida Statutes, noting that "the

alleged common law property right" at issue was not governed by those provisions.

Glazer, 16 So. 2d at 56. But even if we agreed that Glazer supports the recognition

of an exclusive right of public performance for sound recordings, Flo & Eddie still

would not prevail. Glazer concluded that Hoffman's repeated public performances

of the magic trick constituted a publication and dedication such that the general

public had the "lawful right to use" the trick. Id. at 55. Thus, if anything, Glazer

would stand for the proposition that for those "dramatic composition[s]" or

"intellectual production[s]," id., that do not rise to the level of being covered by

federal copyright law—as was the case with Hoffman's magic trick, and as was the

case in 1943 with respect to all sound recordings—any exclusive right of public

performance is lost at the moment of publication. In other words, when

phonorecords are commercially sold, the public would obtain the "lawful right to

use" the sound recordings. Id. In brief, Glazer in no way supports the existence of

an exclusive right of public performance for pre-1972 sound recordings.

The third problem with Flo & Eddie's repeal argument is that the sound

recordings at issue were sold in commerce in Florida at a time when sections

543.02 and 543.03 were in full force and effect.[15]  Flo & Eddie does not appear to dispute that sections 543.02 and 543.03 would have caused any purported public performance rights to be lost in Florida for those sound recordings sold in commerce during that time.  Instead, Flo & Eddie argues that upon repeal of sections 543.02 and 543.03 in 1977, all public performance rights revested in Flo & Eddie.  But even if we agreed that Florida common law did recognize the right of public performance prior to the enactment of sections 543.02 and 543.03 in 1941, and that the repeal of those sections in 1977 revived that common law right, we would reject Flo & Eddie's repeal-and-revive argument for those songs sold in commerce prior to repeal.  Nothing in the legislative history of the repeal or in the cases cited by Flo & Eddie supports the conclusion that such rights revested entirely.  See, e.g., Firestone Tire & Rubber Co. v. Acosta, 612 So. 2d 1361, 1363 (Fla. 1992) (concluding that the repeal of the statute of repose could not "have the effect of reestablishing a cause of action that had been previously extinguished by operation of law").  Even to conclude that such rights only partially revested would be problematic.  For example, a finding that a pre-repeal purchase of, say, "Happy Together" could continue to be freely played in public while a post-repeal purchase

---

15.  The Eleventh Circuit noted certain "facts . . . in the record," including that, among other things, Flo & Eddie was selling copies of its recordings going back to at least 1975.  Flo & Eddie, 827 F.3d at 1022.

of that same recording was subject to licensing and royalty payments would be illogical and unworkable. But of course, Florida common law has never recognized an exclusive right of public performance in sound recordings.

Finally, we note that Flo & Eddie relies on the assertion that New York common law recognizes a right of public performance in pre-1972 sound recordings. In fact, Flo & Eddie argues that this Court's decision in Glazer— which Flo & Eddie interprets as recognizing an exclusive right of public performance for pre-1972 sound recordings—is "entirely in accord with the decisions from New York and Pennsylvania that have arrived at the same conclusion grounded on the English common law adopted in those states as well as in the State of Florida." As an initial matter, the development of New York and Pennsylvania common law is not dispositive here. But in any event, we note that the New York Court of Appeals has since squarely rejected Flo & Eddie's interpretation of New York law. The Court of Appeals has held unequivocally that "New York's common-law copyright has never recognized a right of public performance for pre-1972 sound recordings." Flo & Eddie, 70 N.E.3d at 949. In declining to recognize the right of public performance for the very first time, the

New York Court of Appeals observed that the common law "evolves slowly and incrementally, eschewing sudden or sweeping changes." Id. at 941.[16]

This Court has similarly noted that the common law should be altered only in rare circumstances. See, e.g., In re T.A.C.P., 609 So. 2d 588, 594 (Fla. 1992) (noting that the common law should be altered only when "demanded by public necessity" or when necessary "to vindicate fundamental rights" (citation omitted)); Hoffman v. Jones, 280 So. 2d 431, 435 (Fla. 1973) ("[T]his Court may change the [common law] where great social upheaval dictates."). And we conclude that this case does not demand the recognition of a new common law right of public performance in pre-1972 sound recordings.

In short, we answer the combined and rephrased certified question as follows:

---

16. We note that in the related suit filed by Flo & Eddie against Sirius in California, the federal district court granted Flo & Eddie's motion for summary judgment "but only on the basis of public performance conduct." Flo & Eddie, 2014 WL 4725382, at *1. We also note that California has a statute that addresses pre-1972 sound recordings. See Cal. Civ. Code § 980(a)(2). And we note that the district court in that case relied on the plain language and legislative history of the California statute in reaching its conclusion. Flo & Eddie, 2014 WL 4725382, at *7. Lastly, we note that the issue of public performance rights for sound recordings is currently on appeal before the Ninth Circuit in a similar suit brought by Flo & Eddie against a different defendant, with the Ninth Circuit recently certifying to the California Supreme Court two questions of California law on that issue. See Flo & Eddie, Inc. v. Pandora Media, Inc., 851 F.3d 950, 951 (9th Cir. 2017). But again, the development of California law is not dispositive here.

Florida common law does not recognize an exclusive right of public performance in pre-1972 sound recordings.

Because the issue of public performance rights is, in our view, the determinative issue based on the facts of this case, we only briefly address the remaining two certified questions.

## D. Remaining Two Certified Questions

The Eleventh Circuit certified the following additional question concerning "back-up or buffer copies":

> 3. To the extent that Florida recognizes a common law copyright including a right of exclusive reproduction in sound recordings, whether Sirius's back-up or buffer copies infringe Flo & Eddie's common law copyright exclusive right of reproduction?

Flo & Eddie, 827 F.3d at 1025. Even assuming that Florida common law recognizes the existence of a post-sale exclusive right of reproduction in pre-1972 sound recordings, any such right would not be unfettered and we would conclude that no violation occurred under the facts of this case. We agree with the Second Circuit's conclusion in Flo & Eddie's related suit that, based on the facts, Flo & Eddie's "copying claims" fail because "the ultimate use of the internal copies is permissible." Flo & Eddie, Inc. v. Sirius XM Radio, Inc., 849 F.3d 14, 16-17 (2d Cir. 2017) (citation omitted). And we agree with the district court's decision in this case to dismiss Flo & Eddie's reproduction claims. Flo & Eddie, 2015 WL 3852692, at *6. Finding for Flo & Eddie on this question would require this Court

- 31 -

to, among other things, ignore the fact that for the past four decades, Florida's record piracy statute—albeit a criminal one—has contained a specific exception for copies made "in connection with, or as part of" radio broadcast transmissions. See § 540.11(6)(a), Fla. Stat. (2017).[17] Again, we decline to ignore the relevant history. We therefore answer the third certified question in the negative.

The Eleventh Circuit also certified the following question related to other causes of action asserted by Flo & Eddie:

> 4. To the extent that Florida does not recognize a common law copyright in sound recordings, or to the extent that such a copyright was terminated by publication, whether Flo & Eddie nevertheless has a cause of action for common law unfair competition / misappropriation, common law conversion, or statutory civil theft under Fla. Stat. § 772.11 and Fla. Stat. § 812.014?

Flo & Eddie, 827 F.3d at 1025. We answer this question in the negative. Because Flo & Eddie cannot show that the asserted common law property rights both exist under Florida law and were violated, Flo & Eddie's remaining causes of action necessarily fail. We agree with the district court's decision in this case to summarily dismiss Flo & Eddie's remaining claims as being "without merit" because the claims were "all based on [the] alleged common law copyright." Flo & Eddie, 2015 WL 3852692, at *6. And we agree with the Second Circuit's

---

17. It does not appear to be in dispute that Sirius is a radio broadcaster, albeit a digital/satellite one.

conclusion in Flo & Eddie's related lawsuit that the answer to the certified question involving public performance rights was determinative of all claims. Flo & Eddie, 849 F.3d at 16-17.[18]

## III. CONCLUSION

For the reasons explained above, we combine and rephrase the first two questions certified by the Eleventh Circuit into a single determinative question and hold that Florida common law does not recognize an exclusive right of public performance in pre-1972 sound recordings. And we address the remaining certified questions by concluding that Flo & Eddie's remaining claims fail under Florida law. Having answered the certified questions, we return this case to the Eleventh Circuit Court of Appeals.

---

18. Flo & Eddie's remaining claims are also problematic for other reasons. For example, as to Flo & Eddie's claim for statutory civil theft, section 772.11(1), Florida Statutes, provides a cause of action for treble damages and for reasonable attorney's fees for "[a]ny person who proves by clear and convincing evidence that he or she has been injured in any fashion by reason of any violation of [section 812.014]." Section 812.014, itself, is a criminal theft statute. While the civil remedy set forth in section 772.11(1) only requires a "clear and convincing" evidence standard, the underlying cause of action is predicated on conduct that violates a criminal statute. See Gasparini v. Pordomingo, 972 So. 2d 1053, 1056 (Fla. 3d DCA 2008) ("To establish a claim for civil theft, a party must prove that a conversion has taken place and that the accused party acted with criminal intent."). Again, Florida has a criminal record piracy statute that expressly excepts copies made "in connection with, or as part of" radio broadcast transmissions. § 540.11(6)(a), Fla. Stat. To use an entirely different criminal statute as the basis for imposing civil liability for the same conduct would be illogical.

It is so ordered.

LABARGA, C.J., and PARIENTE, QUINCE, POLSTON, and LAWSON, JJ., concur.
LEWIS, J., concurs in result.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

Certified Question of Law from the United States Court of Appeals for the Eleventh Circuit – Case No. 15-13100

Angel A. Cortinas and Jonathan H. Kaskel of Gunster, Miami, Florida; Henry D. Gradstein and Maryann R. Marzano of Gradstein & Marzano, P.C., Los Angeles, California; and Glen H. Waldman, Eleanor T. Barnett, and Jason Gordon of Waldman Barnett, P.L., Coconut Grove, Florida,

     for Appellant

David M. Gersten of Gordon & Rees Scully Mansukhani, Miami, Florida; and Daniel M. Petrocelli and Cassandra L. Seto of O'Melveny & Myers, LLP, Los Angeles, California, Anton Metlitsky of O'Melveny & Myers, LLP, New York, New York, and Jonathan D. Hacker of O'Melveny & Myers, LLP, Chevy Chase, Maryland,

     for Appellee

Julee L. Milham, St. Pete Beach, Florida, Charlotte C. Towne, Dani Beach, Florida, Stephen M. Carlisle, Fort Lauderdale, Florida, and Robert A. McNeeley, Tallahassee, Florida,

     Amicus Curiae Entertainment, Arts, and Sports Law Section of the Florida Bar

Lisa K. Rushton and Stephen B. Kinnaird of Paul Hastings, LLP, Washington, District of Columbia, Richard Adam Kaplan of National Association of Broadcasters, Washington, District of Columbia,

     Amicus Curiae National Association of Broadcasters

Dineen Pashoukos Wasylik of DPW Legal, Tampa, Florida,

      Amicus Curiae Electronic Frontier Foundation

Danielle M. D'Oyley and Jonathan Y. Ellis of Lathan & Watkins, Washington, District of Columbia, Andrew M. Gass and James K. Lynch of Latham & Watkins, San Francisco, California,

      Amici Curiae iHeartMedia, Inc. and Pandora Media, Inc.

Daniel A. Bushell of Bushell Law, P.A., Fort Lauderdale, Florida,

      Amicus Curiae Copyright and Intellectual Property Law Professors